FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2009 MAR 18   A 11: 03

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| WELLS FARGO BANK, N.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OLD REPUBLIC TITLE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Civil Action No. 1:09cv297
JCC/TRJ

## COMPLAINT AND JURY DEMAND

Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo"), by and through undersigned counsel,

hereby asserts its complaint against Defendant Old Republic National Title Insurance Company

("Old Republic") and alleges as follows:

## NATURE OF THE ACTION

1.      This action arises out of a conspiracy to defraud Wells Fargo and other financial

institutions by originating residential mortgage loans and selling them in the secondary loan

market by fraudulently misrepresenting that the loans were secured by "first-lien" mortgages on

real property in the Commonwealth of Virginia, or, in one case, by a second-lien home equity

loan.

2.      This conspiracy was made possible by Old Republic, a company in the business

of issuing title insurance that insures against, among other risks, defects to title and defalcations

by title companies and/or title agents.  Title insurers like Old Republic generally do not deal

directly with members of the public involved in real estate transactions — such as lenders,

buyers, sellers and/or persons looking to refinance or take out a home equity line of credit on real property. Instead, title insurers establish an agency relationship with title companies and confer upon those title companies actual and apparent authority to act on the title insurer's behalf. Pursuant to this agency relationship, title companies act on the title insurer's behalf in real estate transactions, including (but not limited to) by issuing — in the title insurer's name — title commitments (agreements to issue title insurance policies), title insurance policies, and closing protection letters (agreements to insure against negligence or defalcation by the title company). Under Virginia law, title insurers have an important responsibility to protect the public by supervising and accounting for the acts of their title companies and/or title agents. By statute, title companies cannot operate in Virginia unless they have entered into an agency agreement with a title insurer.

3.     In this case, Old Republic selected as its agents two of the primary conspirators involved in the conspiracy — a title company named TitlePro, Inc. ("TitlePro"), and a TitlePro agent named Kamran Khan ("Khan"). TitlePro's and Khan's co-conspirators included a mortgage company named Financial Mortgage, Inc. ("FMI") and FMI's president Vijay K. Taneja ("Taneja"). At all times relevant to the transactions at issue in this complaint, TitlePro and Khan were authorized agents of Old Republic. Among their other activities, TitlePro and Khan possessed and exercised actual and apparent authority as authorized agents of Old Republic to (among the many services they provided under Old Republic's authority) issue title commitments, title insurance policies, and closing protection letters on behalf of Old Republic. Through these title commitments, title insurance policies, and closing protection letters, Old Republic provided protection to lenders such as Wells Fargo against title defects and against the frauds and defalcations of the title agent, TitlePro.

2

4.      The conspirators were successful in defrauding Wells Fargo and other financial institutions in the secondary loan market. As a direct and proximate result of this conspiracy to defraud, Wells Fargo purchased 17 mortgages or home loans regarding real properties within the Commonwealth of Virginia ("Virginia Properties") — for value and without knowledge of the conspiracy or defects to title — that were the fruit of this fraudulent conspiracy. The total amount due to Wells Fargo in principal and interest on these 17 mortgages or home loans exceeds $9.7 million.

5.      Because of the nature of the conspiracy at issue in this case, Wells Fargo is unlikely to recover much, if any, of the $9.7 million it is due from the borrowers. Many of the borrowers appear to have been deceived as part of the conspiracy. For example, the conspirators instructed some borrowers to sign multiple copies of a note and deed of trust, and then the conspirators sold those copies to two or more financial institutions in the secondary loan market as original notes secured by a deed of trust with first lien priority. In other cases, the conspirators told borrowers that the proceeds of the loan would be used to pay down a prior recorded mortgage, when in fact the conspirators simply kept the money. Under such circumstances, borrowers are unlikely to be willing to pay Wells Fargo pursuant to the notes at issue in this case. Indeed, all of Wells Fargo's loans that were purportedly secured by first lien deeds of trust have fallen into default.

6.      Wells Fargo brings this action against Old Republic to recover for its losses. Wells Fargo alleges claims for breach of contract based upon Old Republic's refusal to honor the terms of the title commitments, title insurance policies and closing protection letters that Old Republic, through its agents TitlePro and Khan, issued regarding the mortgages that are the subject of this action. Wells Fargo also brings claims for business conspiracy in violation of Va.

Code § 18.2-499, civil conspiracy, fraud, violation of the Wet Settlement Act, Va. Code § 6.1-2.13, and negligence based upon Old Republic's responsibility — as a principal — for the tortious, fraudulent, conspiratorial, and/or negligent acts of its agents, TitlePro and Khan.

## PARTIES

7.      Plaintiff Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls, South Dakota, with its principal place of business in San Francisco, California.

8.      On information and belief, Defendant Old Republic National Title Insurance Company is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Old Republic pursuant to Fed. R. Civ. P. 4(k)(1)(a) and Virginia's long-arm statute, Va. Code Ann. § 8.01-328.1, because all of Wells Fargo's claims arise out of conduct by Old Republic — acting directly and through Old Republic's authorized agent TitlePro — that occurred within the Commonwealth of Virginia. This Court also has personal jurisdiction over Old Republic because, among other additional reasons, Old Republic has transacted business in Virginia for purposes of Va. Code Ann. § 8.01-328.1(A)(1) by seeking and obtaining permission to transact business in Virginia and by underwriting title insurance policies in Virginia.

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction) because the matter in controversy exceeds the sum or value of $75,000 and Plaintiff Wells Fargo and Defendant Old Republic are citizens of different states.  In this action, Plaintiff Wells Fargo, a citizen of the State of South Dakota, is seeking more than $9.7 million from Defendant Old Republic, a citizen of the State of Minnesota.

11.    Venue is proper in this Court under 28 U.S.C. § 1391(a)(2) because the events giving rise to the claims asserted in this action occurred, and real property that is the subject of Wells Fargo's claims is located, within the Eastern District of Virginia. Specifically, the contracts at issue were executed within this District, the tortious acts alleged in this complaint were committed within this District, and the mortgage loans at issue in this case relate to real properties located within this District.

## FACTUAL ALLEGATIONS

12.    The conspiracy giving rise to this action involved a scheme to originate unsecured residential real estate mortgage loans and to sell those loans as secured first-lien or second lien mortgages to financial institutions, such as Wells Fargo, in the secondary loan market (the "Conspiracy").

### The Conspirators

13.    The active participants in the Conspiracy included, but may not have been limited to, FMI, Taneja, TitlePro, and Khan (collectively the "Conspirators").

14.    FMI was a Virginia corporation with its principal place of business in Fairfax County, Virginia. FMI was in the business of making residential home loans to individuals and then selling the loans to financial institutions such as Wells Fargo. FMI had originated mortgages in Virginia and in other states since the 1990s. FMI filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code on June 9, 2008, in the United States Bankruptcy Court for the Eastern District of Virginia. On information and belief, FMI's bankruptcy was a result of FMI's liabilities for the harms FMI caused by participating in the Conspiracy.

15.     Taneja was the president and founder of FMI, and he owned, operated and controlled FMI. Taneja, like FMI, filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code on June 9, 2008, in the United States Bankruptcy Court for the Eastern District of Virginia.

16.     Taneja has been prosecuted for his role in the Conspiracy in a case pending before this Court as *United States v. Taneja*, Case No. 1:08CR00428-001 (E.D. Va.). On November 13, 2008, Taneja signed a statement of facts in which he admitted that he conspired with an agent (not identified by name in the statement of facts) of TitlePro to defraud financial institutions in the secondary mortgage market. Also on November 13, 2008, Taneja entered a plea agreement in which he pled guilty to one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). On January 30, 2009, this Court sentenced Taneja to 84 months in prison to be followed by three years of supervised release. On January 30, 2009, this Court also entered an order requiring Taneja to make restitution to certain specifically-identified financial institutions that were victims of Taneja's conspiracy. This Court's January 30, 2009 restitution order requires Taneja to pay Wells Fargo $7,503,350.00. Wells Fargo is unlikely to receive a significant recovery from Taneja.

17.     TitlePro was a title company operating in Fairfax County, Virginia. On information and belief, TitlePro is no longer operating. TitlePro was in the business of providing services related to real estate closings, including searching and examining title records, recording documents in official land records, hosting and executing real estate closings, holding funds in escrow, and issuing title and closing related contracts, including title commitments, title insurance policies, and closing protection letters. As further explained

below, TitlePro was an authorized agent of Old Republic during the time of the transactions that are at issue in this complaint.

18.     Khan was a title agent affiliated with TitlePro.  On information and belief, Khan owned, controlled and operated TitlePro.

## The Conspiracy to Defraud

19.     Taneja, FMI, TitlePro, and Khan all played important roles in the Conspiracy and repeatedly committed certain acts in furtherance of the conspiracy.  Some, but not all, of those acts are set forth below.

20.     In November 2004, FMI entered into a Loan Purchase Agreement (the "Loan Agreement") with Wells Fargo in which Wells Fargo agreed to purchase, and FMI agreed to sell, certain residential mortgage loans.  Pursuant to the Loan Agreement, FMI sold to Wells Fargo the residential mortgage loans regarding the Virginia Properties that are the subject of this lawsuit.

21.     Taneja identified the Virginia Properties, including his own home, to be used by the Conspiracy to generate fraudulent "first-lien" mortgages.

22.     FMI and Taneja, working with TitlePro and Khan, prepared fraudulent mortgage loan documents by having legitimate FMI borrowers, at the time of closing, sign multiple sets of "original" loan documents.  FMI then used these multiple "original" loan documents to create multiple fraudulent notes — all purportedly secured by deeds of trust with "first-lien" priority on the same Virginia Property — which FMI then sold to multiple financial institutions in the secondary loan market.

23.     TitlePro and Khan acted as the title agent for all of the transactions at issue in this case and Khan notarized many of the key documents used in the Conspiracy.

24.     Acting in their capacity as Old Republic's agents, TitlePro and Khan cloaked the fraudulent mortgage loans with a false veil of legitimacy. Specifically, TitlePro and Khan prepared title documents for the Virginia Properties that TitlePro, Khan, and the other Conspirators had no intention of filing. TitlePro and Khan hosted and administered settlement proceedings to create title and settlement documents necessary to facilitate the Conspiracy. TitlePro and Khan also issued — in Old Republic's name and with Old Republic actual and apparent authority — title insurance commitments, title insurance policies, closing protection letters, and similar title insurance documents in connection with the Virginia Properties. In addition, TitlePro and Khan set up fraudulent escrow accounts and transferred funds from those accounts to FMI and the other co-conspirators rather than using the escrow funds for their designated purpose — paying-down prior liens.

25.     As part of the Conspiracy, the Conspirators made numerous fraudulent misrepresentations regarding the mortgages on the Virginia Properties to Wells Fargo, including but not limited to, misrepresentations that:

a.   Wells Fargo's deeds of trust on each of the Virginia Properties would have sole and uncontested first-lien status. At the time they made these misrepresentations, the Conspirators knew that such representations were false and that superior or competing liens existed for all of the Virginia Properties. Indeed, while they were making such representations, the Conspirators were preparing paperwork for — and selling to other financial institutions — other "first lien" mortgages on the same Virginia Properties. The superior liens have resulted in the foreclosure of some of the Virginia Properties.

b.   the proceeds from the notes that Wells Fargo purchased from FMI were used to satisfy prior liens on most of the Virginia Properties. In fact, the Conspirators used the proceeds from the notes that Wells Fargo purchased for purposes other than satisfying prior liens on the Virginia Properties. The unsatisfied prior liens have resulted in the foreclosure of some of the Virginia Properties.

c.   TitlePro would file, and/or had filed, a deed of trust securing each of Wells Fargo's notes in the Virginia land records. In fact, TitlePro and the other Conspirators did not file, and had no intention of filing, a deed of trust securing Wells Fargo's notes in the Virginia land records.

26.   Wells Fargo relied on these misrepresentations when it purchased the mortgage loans at issue in this case. Had Wells Fargo known that the notes at issue in this case were not secured by deeds of trust in first-lien position on the Virginia Properties, it would not have purchased those notes.

27.   As of the time of the filing of this Complaint, all of the loans sold to Wells Fargo that were purportedly secured by first-lien deeds of trust on the Virginia Properties have fallen into default, and several of the loans have been rendered unsecured by another lender that has foreclosed on the subject property pursuant to a prior recorded deed of trust.

**TitlePro's Agency Relationship with Old Republic**

28.   On information and belief, at all times relevant to the transactions at issue in this case, TitlePro and Khan were acting as agents of Old Republic.

29.   The Virginia Code, in the Consumer Real Estate Settlement Protection Act ("CRESPA") and the Insurance Title, establishes that TitlePro was Old Republic's agent for purposes of the transactions at issue in this case. Indeed, TitlePro relied upon its relationship

with Old Republic to satisfy its obligation under Chapter 1.3 of CRESPA, Va. Code § 6.1-2.21,

which requires, among other things, that "[a]ny title insurance agent acting in the capacity of a

settlement agent shall be appointed by a title insurance company licensed in the Commonwealth

pursuant to Chapter 18 (§ 38.2-1800 et seq.) of Title 38.2." In turn, Virginia's Insurance Title,

in Va. Code § 38.2-1801, states that "[a] licensed agent shall be held to be the agent of the

insurer that issued the insurance sold, solicited or negotiated by such agent in any controversy

between the insured or his beneficiary and the insurer." Thus, under Va. Code

§ 38.2-1801, TitlePro "shall be held to be the agent" of Old Republic for purposes of the

transactions at issue in this case.

30.   Moreover, TitlePro and Khan, at all relevant times, were acting as the agents of

Old Republic.

31.   Old Republic and TitlePro entered into a written agreement in which Old

Republic appointed TitlePro to be Old Republic's agent in the Commonwealth of Virginia. The

written agreement authorized TitlePro to, among other things, issue contracts and reports on Old

Republic's behalf. Old Republic, in its written agreement with TitlePro, authorizes TitlePro to

sign, countersign and issue — on Old Republic's behalf — commitments, binders, title reports,

certificates, guarantees, title insurance policies, endorsements and other agreements by which

Old Republic assumes liability for the condition of title to real estate located in the

Commonwealth of Virginia.

32.   Old Republic provided TitlePro with forms (in electronic and/or physical form)

bearing Old Republic's name and trademarks. Old Republic not only authorized, but required,

TitlePro to:

      a.   use those forms in certain dealings with members of the public; and

10

b.  use those forms in providing accounting information to Old Republic.

33.  Old Republic not only authorized, but required, TitlePro to assume responsibility for the collection of premiums, fees and charges on Old Republic's behalf.  Old Republic also provided TitlePro with insurance rate schedules and required TitlePro to quote, charge and collect the rates set forth on those schedules.

34.  Old Republic permitted TitlePro to retain a portion of the premiums, fees or charges attributable to Old Republic insurance policies that TitlePro collected.

35.  Old Republic disclosed information to TitlePro that Old Republic deems confidential, including information relating to Old Republic's financial products, product development, customer lists, business and marketing plans and strategies, and operating policies and manuals.  Old Republic forbade TitlePro from disclosing such information to the public.

36.  Old Republic, at the time of the transactions at issue, identified TitlePro and/or Khan as an Old Republic agent in good standing on Old Republic's website at http://agentstanding.oldrepublictitle.com.

37.  Old Republic exerted significant control over TitlePro, including by:

a.  requiring TitlePro to maintain and preserve files in a manner specified in the written agency agreement between Old Republic and TitlePro;

b.  requiring TitlePro to submit monthly reports to Old Republic;

c.  establishing a right to audit and review TitlePro's files, including TitlePro's policy inventory, title insurance files (including any material, files, records or accounts relating to the issuance of title insurance forms), and all financial and business records relating to any escrow closing or settlement functions conducted by TitlePro;

    d.  requiring TitlePro to adopt specific procedures for handling funds;

    e.  imposing time limits regarding the frequency with which TitlePro must reconcile its accounts, including escrow accounts;

    f.  requiring TitlePro to submit an income statement and balance sheet to Old Republic every year, in a form and including content "satisfactory to" Old Republic; and

    g.  reserving the right to investigate the personal reputation, character, personal characteristics, and mode of living of TitlePro's agents.

38.    Old Republic took possession of TitlePro's files when TitlePro ceased operating or at some point in time thereafter.

39.    Consistent with the agency relationship alleged in paragraphs 28 to 38, Old Republic has admitted in a related case that it is liable for harm caused by the Conspiracy under the terms of the title insurance and closing protection letters TitlePro issued on its behalf. Old Republic filed a proof of claim in Taneja's bankruptcy proceeding asserting a claim for $231,412.59. *See* Proof of Claim No. 30, *In re Vijay K. Taneja*, Case No. 08-13293 (Bankr. E.D. Va.), filed by Old Republic on October 7, 2008. In an attachment to the proof of claim, Old Republic admitted the existence of the Conspiracy, that TitlePro participated in the Conspiracy, and that TitlePro was an "agent for" Old Republic. Specifically, Old Republic stated: "Financial Mortgage, Inc. ('FMI'), and Vijay Taneja ('Taneja'), acting in his own self interest, in collusion with TitlePro Inc. ('TitlePro'), a policy-issuing agent for Old Republic National Title Insurance Company ('Old Republic'), converted the proceeds of a loan ('Loan') to Mr. Phul Zeb ('Zeb') originated by FMI." Old Republic further admitted that TitlePro issued "a commitment ('Commitment') for a loan policy to FMI, and its successors and assigns" and also issued "a

closing protection letter ('CPL') to FMI, and its successors and assigns." Old Republic further admitted that a different Wells Fargo entity, Wells Fargo Home Mortgage, "upon purchasing the loan * * * became the successor of FMI as to the Commitment and the CPL" and therefore assumed FMI's rights under the Commitment and the CPL. Old Republic then asserted, as the basis for its proof of claim, that it was obligated "pursuant to the terms of the Commitment and CPL to protect * * * the priority of the deed of trust securing Wells Fargo's Loan" by paying off prior recorded encumbrances that were supposed to have been satisfied with the proceeds of the note — proceeds that were instead converted by the Conspirators.

**The Contracts That Old Republic Issued Through TitlePro**

40.    Old Republic, acting through its agent TitlePro, issued title commitments, title insurance policies, and closing protection letters in each of the transactions involving the Virginia Properties that are at issue in this case.

41.    The title commitments that Old Republic issued through TitlePro obligated Old Republic to issue an insurance policy containing — and bound Old Republic to — the terms of the American Land Title Association ("ALTA") Loan Policy, as revised on October 17, 1992 ("ALTA Loan Policy"). Under the terms of the ALTA Loan Policy, Old Republic insures, among other things, against loss or damage (not to exceed the amount of insurance stated in the policy) sustained or incurred by the "insured" by reason of: "[t]itle to the estate or interest described in Schedule A being vested other than as stated therein; [a]ny defect in or lien or encumbrance on the title; [u]nmarketability of the title; * * * [t]he invalidity or unenforceability of the lien of the insured mortgage upon the title; [or t]he priority of any lien or encumbrance over the lien of the insured mortgage."

42.     The ALTA Loan Policy provides that Old Republic "will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations."

43.     The ALTA Loan Policy defines "insured" to include successors in ownership of the indebtedness, and further includes within the definition of "insured" "the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land)."

44.     Wells Fargo purchased each of the notes at issue in this case from FMI for value and without knowledge of the defects, liens, encumbrances, adverse claims and other matters that deprived Wells Fargo of its promised security interests in the Virginia Properties. Accordingly, Wells Fargo is an "insured" with respect to the notes it purchased from FMI, and any rights or defenses under the title commitments, title insurance policies and closing protection letters that Old Republic may have had against FMI do not apply to Wells Fargo.

45.     On information and belief, in addition to issuing title commitments and title insurance policies, Old Republic, acting through TitlePro, issued closing protection letters for each of the transactions involving the Virginia Properties at issue in this case.

46.     In the closing protection letters Old Republic issued, Old Republic agrees, subject to certain terms and conditions, to reimburse FMI and its successors or assigns for certain losses

incurred in connection with the closing described in the closing protection letter. Specifically, Old Republic agrees to reimburse FMI and its successors or assigns for losses that arise out of a "[f]ailure of the Issuing Agent [TitlePro] to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien." Old Republic also agrees to reimburse FMI and its successors or assigns for losses that arise out of "[f]raud or dishonesty of the Issuing Agent [TitlePro] or Approved Attorney in handling your funds or documents in connection with such closings to the extent such fraud or dishonesty relates to the status of the title to said interest in land or to the validity, enforceability and priority of the lien of said mortgage on said interest in land."

### The Virginia Properties, Deeds of Trust and Transactions at Issue

47. Pursuant to the conspiracy, FMI sold to Wells Fargo 17 notes based on fraudulent misrepresentations that each of Wells Fargo's notes would be protected by a "first lien" security interest in one of the Virginia Properties, or, in one case, by a valid second lien on a Virginia Property. Wells Fargo's losses in this case include unpaid principle and interest due under these 17 notes in the amount of $9,702,971.87.

### 15905 Carroll Avenue, Woodbridge, Virginia 22191

48. On November 5, 2007, FMI sold Wells Fargo a $351,600.00 note ("Carroll Avenue Note"). Loan records indicate that the Carroll Avenue Note was issued on September 10, 2007 pursuant to a transaction ("Carroll Avenue Transaction") to refinance a parcel of real property located at 15905 Carroll Avenue, Woodbridge, Virginia 22191 ("Carroll Avenue Property"). The Conspirators misrepresented to Wells Fargo that the Carroll Avenue Note was

secured by a deed of trust in "first lien" position on the Carroll Avenue Property.  Khan of

TitlePro served as the title agent for the Carroll Avenue Transaction and notarized the Carroll

Avenue Note and the deed of trust on the Carroll Avenue Property.  On information and belief,

TitlePro prepared the deed of trust used in the Carroll Avenue Transaction.

49.     TitlePro generated a HUD settlement statement for the Carroll Avenue

Transaction on September 10, 2007.  A HUD settlement statement is a form designed by the

U.S. Department of Housing and Urban Development that provides an accounting for a real

estate transaction.  A HUD settlement statement identifies the amounts paid by the borrower to

the seller and identifies any third parties who should receive payment from the transaction, such

as the holder of an existing mortgage to be satisfied from the transaction's proceeds.  Among

other information, the HUD settlement statement also identifies the nature of the real estate

transaction (e.g., sale or refinance), the title company, the title insurer, and the fees paid for

notary service, title searches, and title insurance in relation to the transaction.

50.     The HUD settlement statement for the Carroll Avenue Property listed two prior

encumbrances — a first mortgage held by Chase Home Finance ("Chase Deed") in the amount

of $280,000.00 and a second mortgage for $52,130.49 held by Specialized Loan Services.  The

HUD settlement statement further indicated that both of these encumbrances would be paid

down with the proceeds of the Carroll Avenue Note.  The Chase Deed, Instrument #

200509070154062, had been recorded on September 7, 2005 before Wells Fargo purchased the

Carroll Avenue Note.  The HUD settlement statement identifies TitlePro as the settlement agent

for the Carroll Avenue Transaction and lists numerous "TITLE CHARGES" paid to TitlePro.

51.     On September 13, 2007, Old Republic, acting through its agents TitlePro and/or

Khan, issued a closing protection letter regarding the Carroll Avenue Transaction to "Financial

Mortgage Inc. ISOA [Its Successors Or Assigns] /Gateway Bank F.S.B." The closing protection letter lists Kamran Khan as the "AGENT CONTACT."

52.     Old Republic, acting through its agents TitlePro and/or Khan, also issued a title commitment for the Carroll Avenue Transaction, Commitment No. PP-090716 for ALTA Loan Policy (10-17-92), for title insurance coverage in the amount of $351,600.00. Old Republic's issuance of title insurance for the Carroll Avenue Transaction is confirmed in the HUD settlement statement for the Transaction, which reflects that the borrower paid $1,620.30 to Old Republic for title insurance coverage in the amount of $351,600.00.

53.     The deed of trust reflected that the Carroll Avenue Transaction was a "refinance" and the HUD settlement statement reflected that the proceeds of FMI's note were to be used to pay down the two prior existing mortgages. Nevertheless, TitlePro did not use the proceeds of the Carroll Avenue Note to pay down the Chase Deed or the second mortgage on the property held by Specialized Loan Services. On information and belief, TitlePro instead transferred the proceeds of the Carroll Avenue Note to FMI pursuant to the Conspiracy.

54.     TitlePro never recorded a deed of trust in the Prince William County land records for the $351,600.00 Carroll Avenue Note that FMI issued pursuant to the Carroll Avenue Transaction and sold to Wells Fargo.

55.     On or about March 10, 2008, the U.S. Bank National Association, as Trustee for Terwin Mortgage Trust, foreclosed the Carroll Avenue Property acting pursuant to the Chase Deed. Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position and the property has been foreclosed, Wells Fargo's interest in the Carroll Avenue Note is not secured by an interest in the Carroll Avenue Property. The current outstanding principal

and interest on the Carroll Avenue Note — which was supposed to be (but was not) secured by a first lien on the Carroll Avenue Property — is $373,355.25.

### 20251 Mohegan Drive, Ashburn, Virginia 20147

56.     On November 9, 2007, FMI sold Wells Fargo a $412,350.00 note ("Mohegan Drive Note"). Loan records indicate that the Mohegan Drive Note was issued on September 20, 2007 pursuant to a transaction ("Mohegan Drive Transaction") to refinance a parcel of real property located at 20251 Mohegan Drive, Ashburn, Virginia 20147 ("Mohegan Drive Property"). The Conspirators misrepresented to Wells Fargo that the Mohegan Drive Note was secured by a deed of trust in "first lien" position on the Mohegan Drive Property. Khan of TitlePro served as the title agent for the Mohegan Drive Transaction and notarized the Mohegan Drive Note and the deed of trust on the Mohegan Drive Property. On information and belief, TitlePro prepared the deed of trust used in the Mohegan Drive Transaction.

57.     TitlePro generated a HUD settlement statement for the Mohegan Drive Transaction on September 20, 2007. The HUD settlement statement listed one prior encumbrance on the Mohegan Drive Property — a first mortgage held by Countrywide Home Loans in the amount of $410,953.12. The HUD settlement statement further indicated that this encumbrance would be paid-off with the proceeds of the note that FMI issued as part of the Mohegan Drive Transaction. The Countrywide deed of trust had been recorded on September 22, 2005, Instrument # 200509230108490, before Wells Fargo purchased the Mohegan Drive Note. The HUD settlement statement identifies TitlePro as the settlement agent for the Mohegan Drive Transaction and lists two "TITLE CHARGES" paid to TitlePro.

58.     On October 17, 2007, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Mohegan Drive Transaction to Financial

Mortgage Inc. ISAOA [Its Successors And/Or Assigns] ATIMA [As Their Interests May Appear]. The closing protection letter lists Kamran Khan as the "AGENT CONTACT."

59.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued title insurance, in the form reflected in the standard ALTA Loan Policy (10-17-92) Form, for the Mohegan Drive Transaction. Old Republic's issuance of this title insurance is confirmed in the HUD settlement statement for the Mohegan Drive Transaction, which reflects that the borrower paid $1,039.64 to Old Republic for title insurance with a coverage amount of $412,350.00.

60.    The deed of trust for the Mohegan Drive Property clearly reflected that the Mohegan Drive Transaction was a "refinance" and the HUD settlement statement clearly reflected that the proceeds of the Mohegan Drive Note were to be used to pay down the prior existing Countrywide Home Loans deed of trust. Nevertheless, TitlePro did not use the proceeds of the note issued by FMI to pay down the Countrywide Home Loans deed of trust. On information and belief, TitlePro instead transferred the proceeds of the note to FMI pursuant to the Conspiracy.

61.    TitlePro never recorded a deed of trust in the Loudon County land records for the $412,350.00 Mohegan Drive Note that FMI issued pursuant to the Mohegan Drive Transaction.

62.    On or about November 20, 2007, Franklin Bank, SSB registered a deed of trust for $412,350.00 (the exact same amount as the Mohegan Drive Note purchased by Wells Fargo) in the Mortgage Electronic Registration System ("MERS"). On information and belief, the Conspirators sold the same Mohegan Drive Note to more than one financial institution in the secondary loan market.

63.     Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position, Wells Fargo's Mohegan Drive Note is not properly secured by an interest in the Mohegan Drive Property. The current outstanding principal and interest on the Mohegan Drive Note — which was supposed to be (but was not) secured by a first lien on the Mohegan Drive Property — is $439,043.08.

### 2524 Hildas Way, Woodbridge, Virginia  22191

64.     On January 28, 2008, FMI sold Wells Fargo a $391,000.00 note ("Hildas Way Note"). Loan records indicate that the Hildas Way Note was issued on September 28, 2007 pursuant to a transaction ("Hildas Way Transaction") in which an individual, Christine Cunningham ("Cunningham"), purportedly purchased from Khan a parcel of real property located at 2524 Hildas Way, Woodbridge, Virginia  22191 ("Hildas Way Property"). The Conspirators misrepresented to Wells Fargo that the Hildas Way Note was secured by a deed of trust in "first lien" position on the Hildas Way Property. TitlePro served as the settlement agent for the Hildas Way Transaction. On information and belief, Cunningham was an employee of TitlePro, and TitlePro prepared the deed of trust used in the Hildas Way Transaction.

65.     Neither TitlePro nor anyone else filed a deed in the Prince William County land records transferring ownership of the Hildas Way Property from Khan to Cunningham. Nor did TitlePro record a deed of trust for the $391,000.00 Hildas Way Note.

66.     TitlePro generated a HUD settlement statement for the Hildas Way Transaction on September 28, 2007. The HUD settlement statement listed two prior encumbrances on the Hildas Way Property — a first mortgage held by Aurora Loan Services in the amount of $399,996.41 and a second mortgage for $48,796.32 held by EMC Mortgage. The HUD settlement statement indicates that the Aurora Loan Services and EMC Mortgage encumbrances

on the Hildas Way Property would be paid-off with the proceeds of the Hildas Way Note. The HUD settlement statement also identifies TitlePro as the settlement agent on the transaction and lists three "TITLE CHARGES" paid to TitlePro.

67.     On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter to FMI and its successors or assigns as part of the Hildas Way Transaction.

68.     Old Republic, acting through its agents TitlePro and/or Khan, also issued a title commitment for the Hildas Way Transaction, Commitment No. PP-110734 for ALTA Loan Policy (10-17-92), for title insurance coverage in the amount of $391,000.00. Old Republic's issuance of title insurance for the Hildas Way Transaction is confirmed in the HUD settlement statement for the Transaction, which reflects that the borrower paid $988.40 to Old Republic for title insurance coverage in the amount of $391,000.00.

69.     The deed of trust reflected that the Hildas Way Transaction was a property sale and the HUD settlement statement reflected that the proceeds of the Hildas Way Note were to be used to pay down the two prior existing mortgages. Nevertheless, TitlePro did not use the proceeds of the Hildas Way Note to pay down the Aurora Loan Services and EMC Mortgage encumbrances. On information and belief, TitlePro instead transferred the proceeds of the Hildas Way Note to FMI pursuant to the Conspiracy.

70.     On or about March 10, 2008, Aurora Loan Services foreclosed on the Hildas Way Property pursuant to a deed of trust (instrument #200509190163904) issued to David Neal as trustee for the benefit of MERS. At the time of foreclosure, Khan was still listed as the owner of the Hildas Way Property in the land records for Prince William County.

71.     Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position and the property has been foreclosed, Wells Fargo's Hildas Way Note is not secured by an interest in the Hildas Way Property.  The current outstanding principal and interest on the Hildas Way Note — which was supposed to be (but was not) secured by a first lien on the Hildas Way Property — is $414,851.80.

### 13997 Sawteeth Way, Centreville, Virginia  20121

72.     On December, 28, 2007, FMI sold Wells Fargo a $417,000.00 note ("Sawteeth Way Note").  Loan records indicate that the Sawteeth Way Note was issued on September 28, 2007 pursuant to a transaction ("Sawteeth Way Transaction") in which Christine Cunningham purportedly purchased from Khan another parcel of real property located at 13997 Sawteeth Way, Centreville, Virginia  22191 ("Sawteeth Way Property").  The Conspirators misrepresented to Wells Fargo that the Sawteeth Way Note was secured by a deed of trust in "first lien" position on the Sawteeth Way Property.  TitlePro served as the settlement agent for the Sawteeth Way Transaction.  On information and belief, TitlePro prepared the deed of trust used in the Sawteeth Way Transaction.

73.     Neither TitlePro nor anyone else filed a deed in the Prince William County land records transferring ownership of the Sawteeth Way Property from Khan to Cunningham.  Nor did TitlePro record a deed of trust for the $417,000.00 Sawteeth Way Note that FMI issued pursuant to the Sawteeth Way Transaction.

74.     The Fairfax County land records reflect that Americas Wholesale Lender recorded a deed of trust for the Sawteeth Way Property in the Fairfax County land records on January 3, 2006, in book #18151, page 0665.  According to the Fairfax County land records, Americas Wholesale Lender's deed of trust was never released and remains in effect.  The MERS system

confirms that Americas Wholesale Lender's mortgage is registered as an active lien on the Sawteeth Way Property.

75.     The Fairfax County land records reflect that Manufacturers and Traders Trust Company also recorded a deed of trust for the Sawteeth Way Property in the Fairfax County land records on March 21, 2006, in book # 18349, page 1217. According to the Fairfax County land records, Manufacturers and Traders Trust Company's deed of trust was never released and remains in effect.

76.     TitlePro generated a HUD settlement statement for the Sawteeth Way Transaction on September 28, 2007. The HUD settlement statement identifies TitlePro as the settlement agent for the Sawteeth Way Transaction and lists three "TITLE CHARGES" paid to TitlePro.

77.     On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Sawteeth Way Transaction to FMI and its successors or assigns as their interests may appear.

78.     Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Sawteeth Way Transaction, Commitment No. PP-090738 for ALTA Loan Policy (10-17-92), to provide insurance coverage in the amount of $417,000.00 to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the Sawteeth Way Transaction is confirmed in the HUD settlement statement for the Transaction, which reflects that the borrower paid $1,050.80 to Old Republic for title insurance coverage in the amount of $417,000.00.

79.     The deed of trust reflected that the Sawteeth Way Transaction was a property sale. Nevertheless, TitlePro did not use the proceeds of the Sawteeth Way Note to pay down either the Americas Wholesale Lender's lien or the Manufacturers and Traders Trust Company's lien on

the Sawteeth Way Property. On information and belief, TitlePro instead transferred the proceeds of the Sawteeth Way Note to FMI pursuant to the Conspiracy.

80.     Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position, Wells Fargo's Sawteeth Way Note is not properly secured by an interest in the Sawteeth Way Property. The current outstanding principal and interest on the Sawteeth Way Note — which was supposed to be (but was not) secured by a first lien on the Sawteeth Way Property — is $440,890.60.

### 2247 Christy Place, Herndon, Virginia 20170

81.     On December 11, 2007, FMI sold Wells Fargo a $345,000.00 note ("Christy Place Note"). Loan records indicate that the Christy Place Note was issued on September 10, 2007, pursuant to a transaction ("Christy Place Transaction") to refinance a parcel of real property located at 2247 Christy Place, Herndon, Virginia 20170 ("Christy Place Property"). The Conspirators misrepresented to Wells Fargo that the Christy Place Note was secured by a deed of trust in "first lien" position on the Christy Place Property. Khan of TitlePro served as the title agent for the Christy Place Transaction and notarized the Christy Place Note and the deed of trust on the Christy Place Property. On information and belief, TitlePro prepared the deed of trust used in the Christy Place Transaction.

82.     TitlePro generated a HUD settlement statement for the Christy Place Transaction on September 10, 2007. The HUD settlement statement listed two prior encumbrances on the Christy Place Property — a first mortgage held by Countrywide Home Loans in the amount of $275,000.00 and a second mortgage also held by Countrywide Home Loans in the amount of $66,566.52. The HUD settlement statement further indicated that these encumbrance would be paid-off with the proceeds of the note that FMI issued as part of the Christy Place Transaction.

The Countrywide Home Loans deed of trust had been recorded on January 28, 2005, before Wells Fargo purchased the Christy Place Note. The HUD settlement statement identifies TitlePro as the settlement agent for the Christy Place Transaction and lists three "TITLE CHARGES" paid to TitlePro.

83.     On October 24, 2007, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Christy Place Transaction to Financial Mortgage Inc. ISAOA [Its Successors And/Or Assigns] ATIMA [As Their Interests May Appear]. The closing protection letter lists Khan as the "AGENT CONTACT."

84.     Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Christy Place Transaction, Commitment No. PP-100731 for ALTA Loan Policy (10-17-92), to provide insurance coverage in the amount of $345,000.00 to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the Christy Place Transaction is confirmed in the HUD settlement statement for the Christy Place Transaction, which reflects that the borrower paid $878.00 to Old Republic for title insurance coverage in the amount of $345,000.00.

85.     The deed of trust for the Christy Place Property reflected that the Christy Place Transaction was a "refinance" and the HUD settlement statement reflected that the proceeds of the Christy Place Note were to be used to pay down the two prior existing mortgages held by Countrywide Home Loans. Nevertheless, TitlePro did not use the proceeds of the note issued by FMI to pay down the mortgages held by Countrywide Home Loans. On information and belief, TitlePro instead transferred the proceeds of the Christy Place Note to FMI pursuant to the Conspiracy.

86.     TitlePro never recorded a deed of trust in the Fairfax County land records for the $345,000.00 Christy Place Note that FMI issued pursuant to the Christy Place Transaction. On or about November 14, 2007, Franklin Bank, SSB registered a deed of trust for $345,000.00 (the exact same amount as the Christy Place Note that Wells Fargo purchased from FMI) in the MERS system. On information and belief, the Conspirators sold the same Christy Place Note to more than one financial institution in the secondary mortgage market.

87.     The Christy Place Property became the subject of foreclosure proceedings on May 29, 2008. Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position and the property has been foreclosed, Wells Fargo's Christy Place Note is not secured by an interest in the Christy Place Property. The current outstanding principal and interest on the Christy Place Note — which was supposed to be (but was not) secured by a first lien on the Christy Place Property — is $363,885.87.

### 3375 Oakham Mount Drive, Triangle, Virginia 22172

88.     On November 8, 2007, FMI sold Wells Fargo a $490,000.00 note ("OM Drive Note"). Loan records indicate that the OM Drive Note was issued on September 20, 2007 pursuant to a transaction ("OM Drive Transaction") to refinance a parcel of real property located at 3375 Oakham Mount Drive, Triangle, Virginia 22172 ("OM Drive Property"). The Conspirators misrepresented to Wells Fargo that the OM Drive Note was secured by a deed of trust in "first lien" position on the OM Drive Property. Khan of TitlePro served as the title agent for the OM Drive Transaction and notarized the OM Drive Note and the deed of trust on the OM Drive Property. On information and belief, TitlePro prepared the deed of trust used in the OM Drive Transaction.

89.     TitlePro generated a HUD settlement statement for the OM Drive Transaction on September 20, 2007. The HUD settlement statement listed a prior encumbrance on the OM Drive Property — a mortgage held by Mortgage IT in the amount of $490,175.30. The HUD settlement statement further indicated that this encumbrance would be paid-off with the proceeds of the OM Drive Note. According to the Prince William County land records, the Mortgage IT deed of trust had been recorded on June 2, 2007, before Wells Fargo purchased the OM Drive Note. The HUD settlement statement identifies TitlePro as the settlement agent for the OM Drive Transaction and lists four "TITLE CHARGES" paid to TitlePro.

90.     On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the OM Drive Transaction to Financial Mortgage Inc. and its successors and assigns as their interests may appear as part of the OM Drive Transaction.

91.     On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the OM Drive Transaction to provide insurance coverage in the amount of $490,000.00 to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the OM Drive Transaction is confirmed in the HUD settlement statement for the OM Drive Transaction, which reflects that the borrower paid $1,226.00 to Old Republic for title insurance coverage in the amount of $490,000.00.

92.     The deed of trust for the OM Drive Property reflected that the OM Drive Transaction was a "refinance" and the HUD settlement statement reflected that the proceeds of the OM Drive Note were to be used to pay down the prior existing mortgage held by Mortgage IT. Nevertheless, TitlePro did not use the proceeds of the note issued by FMI to pay down the

mortgage held by Mortgage IT. On information and belief, TitlePro instead transferred the proceeds of the OM Drive Note to FMI pursuant to the Conspiracy.

93.    TitlePro never recorded a deed of trust in the Prince William County land records for the $490,000.00 OM Drive Note that FMI issued pursuant to the OM Drive Transaction. Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position, Wells Fargo's OM Drive Note is not properly secured by an interest in the OM Drive Property. The current outstanding principal and interest on the OM Drive Note — which was supposed to be (but was not) secured by a first lien on the OM Drive Property — is $521,441.63.

### 14763 Winding Loop, Woodbridge, Virginia 22191

94.    On January 9, 2008, FMI sold Wells Fargo a $255,000.00 note ("Winding Loop Note"). Loan records indicate that the Winding Loop Note was issued on November 23, 2007, pursuant to a transaction ("Winding Loop Transaction") to refinance a parcel of real property located at 14763 Winding Loop, Woodbridge, Virginia 22191 ("Winding Loop Property"). The Conspirators misrepresented to Wells Fargo that the Winding Loop Note was secured by a deed of trust in "first lien" position on the Winding Loop Property. Khan of TitlePro served as the title agent for the Winding Loop Transaction and notarized the Winding Loop Note and the deed of trust on the Winding Loop Property. On information and belief, TitlePro prepared the deed of trust used in the Winding Loop Transaction.

95.    TitlePro generated a HUD settlement statement for the Winding Loop Transaction on November 23, 2007. The HUD settlement statement listed a prior recorded mortgage on the Winding Loop Property held by Amtrust Bank in the amount of $238,847.84. The HUD settlement statement further indicated that this encumbrance would be paid off with the proceeds from the Winding Loop Note. According to the Prince William County land records, the

Amtrust Bank deed of trust had been recorded on December 1, 2004, before Wells Fargo purchased the Winding Loop Note. The HUD settlement statement identifies TitlePro as the settlement agent for the Winding Loop Transaction and lists seven "TITLE CHARGES" paid to TitlePro.

96.     On November 27, 2007, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Winding Loop Transaction to Financial Mortgage Inc. ISAOA [Its Successors And/Or Assigns] ATIMA [As Their Interests May Appear]. The closing protection letter lists Khan as the "AGENT CONTACT."

97.     Old Republic, acting through its agents TitlePro and/or Khan, also issued a title commitment for the Winding Loop Transaction to provide insurance coverage in the amount of $255,000.00 to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the Winding Loop Transaction is confirmed in the HUD settlement statement for the Winding Loop Transaction, which reflects that the borrower paid $662.00 to Old Republic for title insurance coverage in the amount of $255,000.00.

98.     The deed of trust for the Winding Loop Property reflected that the Winding Loop Transaction was a "refinance" and the HUD settlement statement reflected that the proceeds of the Winding Loop Note were to be used to pay down the prior recorded Amtrust Bank mortgage. Nevertheless, TitlePro did not use the proceeds of the note issued by FMI to pay down the Amtrust Bank mortgage. On information and belief, TitlePro instead transferred the proceeds of the Winding Loop Note to FMI pursuant to the Conspiracy.

99.     Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position, Wells Fargo's Winding Loop Note is not properly secured by an interest in the Winding Loop Property. The current outstanding principal and interest on the Winding Loop

Note — which was supposed to be (but was not) secured by a first lien on the Winding Loop Property — is $269,456.95.

### 25872 Poland Road, Chantilly, Virginia 20152 – Refinance Loan

100.   On April 16, 2007, FMI sold Wells Fargo a $613,600.00 note ("Poland Road Refinance Note"). Loan records indicate the Poland Road Refinance Note was issued on March 29, 2007, pursuant to a transaction ("Poland Road Refinance Transaction") to refinance a parcel of real property located at 25872 Poland Road, Chantilly, Virginia 20152 ("Poland Road Property"). The Conspirators misrepresented to Wells Fargo that the Poland Road Refinance Note was secured by a deed of trust in "first lien" position on the Poland Road Property. Khan of TitlePro served as the title agent for the Poland Road Refinance Transaction and notarized the deed of trust on the Poland Road Property. On information and belief, TitlePro prepared the deed of trust used in the Poland Road Refinance Transaction.

101.   TitlePro generated a HUD settlement statement for the Poland Road Refinance Transaction on March 29, 2007. The HUD settlement statement characterizes the Poland Road Property as a "refinance," identifies TitlePro as the settlement agent for the Poland Road Refinance Transaction and lists eight "TITLE CHARGES" paid to TitlePro. The HUD settlement statement fails to reference a mortgage in the amount of $4,345,000.00, which was recorded in the Loudon County land records on July 6, 2006.

102.   On April 3, 2007, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Poland Road Refinance Transaction to Financial Mortgage Inc. ISAOA [Its Successors And/Or Assigns] ATIMA  [As Their Interests May Appear]. The closing protection letter lists Khan as the "AGENT CONTACT."

103.    Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Poland Road Refinance Transaction, Commitment No. PP-030719 for ALTA Loan Policy (10-17-92) to provide title insurance coverage to Financial Mortgage and its successors and/or assigns effective March 6, 2007.  Old Republic's issuance of title insurance for the Poland Road Refinance Transaction is confirmed in the HUD settlement statement for the Poland Road Refinance Transaction, which reflects that the borrower paid $1,578.00 to Old Republic for title insurance coverage in the amount of $613,600.00.

104.    The MERS system reflects that EMC Mortgage Corporation and MidFirst Bank each also registered a mortgage on the Poland Road Property for notes issued on March 29, 2007 (the date of the Poland Road Refinance Note that Wells Fargo purchased from FMI) in the amount of $613,600.00 (the exact same amount as the Poland Road Refinance Note that Wells Fargo purchased from FMI).  On information and belief, FMI and its co-conspirators sold the same Poland Road Refinance Note to more than one financial institution in the secondary mortgage market.

105.    TitlePro recorded a deed of trust in the Loudoun County land records for the Poland Road Refinance Note that FMI issued pursuant to the Poland Road Refinance Transaction.  However, a false certificate of satisfaction was entered fraudulently on March 6, 2008, despite the fact that the Poland Road Refinance Note has never been paid off.

106.    Because Wells Fargo's deed of trust does not occupy a recorded, perfected, and uncontested first lien position on the Poland Road Property, Wells Fargo's Poland Road Refinance Note is not properly secured by an interest in the Poland Road Property.  The current outstanding principal and interest on the Poland Road Refinance Note — which was supposed to be (but was not) secured by a first lien on the Poland Road Property — is $621,790.52.

**25872 Poland Road, Chantilly, Virginia 20152 – Home Equity Loan**

107.   On April 20, 2007, FMI sold Wells Fargo a $115,050.00 note related to a home

equity loan ("Poland Road HE Note). Loan records indicate that the Poland Road HE Note was

issued on March 29, 2007, pursuant to a transaction to access home equity ("Poland Road HE

Transaction) in the Poland Road Property. The Conspirators misrepresented to Wells Fargo that

the Poland Road HE Note was secured by a deed of trust in second lien position, behind the

Poland Road Refinance Note, on the Poland Road Property. Khan of TitlePro served as the title

agent for the Poland Road HE Transaction and notarized the Poland Road HE Note and the

second deed of trust on the Poland Road Property. On information and belief, TitlePro prepared

the deed of trust used in the Poland Road HE Transaction.

108.   TitlePro generated a HUD settlement statement for the Poland Road HE

Transaction on March 29, 2007. The HUD settlement statement fails to reference a mortgage in

the amount of $4,345,000.00, which was recorded in the Loudon County land records on July 6,

2006.

109.   On April 3, 2007, Old Republic, acting through its agents TitlePro and/or Khan,

issued a closing protection letter regarding the Poland Road Transaction to Financial Mortgage

Inc. ISAOA [Its Successors And/Or Assigns] ATIMA [As Their Interests May Appear]. The

closing protection letter lists Khan as the "AGENT CONTACT."

110.   Old Republic, acting through its agents TitlePro and/or Khan, issued a title

commitment for the Poland Road HE Transaction, Commitment No. PP-030719 for ALTA Loan

Policy (10-17-92) to provide title insurance coverage to Financial Mortgage and its successors

and/or assigns effective March 6, 2007. Old Republic's issuance of title insurance for the

Poland Road HE Transaction is confirmed in the HUD settlement statement for the Poland Road

HE Transaction, which reflects that the borrower paid $428.40 to Old Republic for title insurance coverage in the amount of $115,050.00.

111.    TitlePro recorded a deed of trust in the Loudoun County land records for the Poland Road HE Note listing MERS as the beneficiary.  However, the MERS system reflects that EMC Mortgage Corporation registered a mortgage on the Poland Road Property for a note issued on March 29, 2007 (the date of the Poland Road HE Note that Wells Fargo purchased from FMI) in the amount of $115,050.00 (the exact same amount as the Poland Road HE Note that Wells Fargo purchased from FMI).  On information and belief, FMI and its co-conspirators sold the same Poland Road HE Note to more than one financial institution in the secondary mortgage market.

112.    Because Wells Fargo's deed of trust does not occupy a recorded, perfected, and uncontested second lien position on the Poland Road Property, Wells Fargo's Poland Road HE Note is not properly secured by an interest in the Poland Road Property.  The current outstanding principal and interest on the Poland Road HE Note — which was supposed to be (but was not) secured by a second lien on the Poland Road Property — is $113,390.45.

### 12547 Armada Place, Woodbridge, Virginia  22191

113.    On January 24, 2008, FMI sold Wells Fargo a $280,000.00 note ("Armada Place Note").  Loan records indicate that the Armada Place Note was issued on November 29, 2007, pursuant to a transaction ("Armada Place Transaction") to refinance a parcel of real property located at 12547 Armada Place, Woodbridge, Virginia  22191 ("Armada Place Property").  The Conspirators misrepresented to Wells Fargo that the Armada Place Note was secured by a deed of trust in "first lien" position on the Armada Place Property.  Khan of TitlePro served as the title agent for the Armada Place Transaction and notarized the Armada Place Note and the deed

of trust on the Armada Place Property. On information and belief, TitlePro prepared the deed of trust used in the Armada Place Transaction.

114.    TitlePro generated a HUD settlement statement for the Armada Place Transaction on November 29, 2007. The HUD settlement statement listed a prior recorded mortgage on the Armada Place Property held by Countrywide Home Loans in the amount of $251,589.17. The HUD settlement statement further indicated that the Countrywide Home Loans mortgage would be paid-off with the proceeds of the Armada Place Note. The Countrywide Home Loans deed of trust had been recorded in the Prince William County land records on December 20, 2006, before Wells Fargo purchased the Armada Place Note. The HUD settlement statement identifies TitlePro as the settlement agent for the Armada Place Transaction and lists two "TITLE CHARGES" paid to TitlePro.

115.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter to Financial Mortgage Inc. and its successors and assigns as their interests may appear.

116.    Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Armada Place Transaction, Commitment No. PP-110728 for ALTA Loan Policy (10-17-92), to provide insurance coverage in the amount of $395,000.00 to Financial Mortgage and its successors and/or assigns effective November 19, 2007. Old Republic's issuance of title insurance for the Armada Place Transaction is confirmed in the HUD settlement statement for the Armada Place Transaction, which reflects that the borrower paid $722.00 to Old Republic for title insurance coverage in the amount of $280,000.00.

117.    The deed of trust for the Armada Place Property reflected that the Armada Place Transaction was a "refinance" and the HUD settlement statement reflected that the proceeds of

the Armada Place Note were to be used to pay down the prior existing mortgage held by Countrywide Home Loans. Nevertheless, TitlePro did not use the proceeds of the note issued by FMI to pay down the mortgage held by Countrywide Home Loans. On information and belief, TitlePro instead transferred the proceeds of the Armada Place Note to FMI pursuant to the Conspiracy.

118.    The MERS system reflects that Franklin Bank, SSB registered a mortgage on the Armada Place Property for a note issued on November 29, 2007 (the date of the Armada Place Note that Wells Fargo purchased from FMI) in the amount of $280,000.00 (the exact same amount as the Armada Place Note that Wells Fargo purchased from FMI). On information and belief, the Conspirators sold the same Armada Place Note to more than one financial institution in the secondary mortgage market.

119.    Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position, Wells Fargo's Armada Place Note is not properly secured by an interest in the Armada Place Property. The current outstanding principal and interest on the Armada Place Note — which was supposed to be (but was not) secured by a first lien on the Armada Place Property — is $292,579.48.

### 9671 Janet Rose Court, Manassas, Virginia 20111

120.    On December 26, 2007, FMI sold Wells Fargo a $500,000.00 note ("Janet Rose Note"). Loan records indicate that the Janet Rose Note was issued on September 20, 2007 pursuant to a transaction ("Janet Rose Transaction") to refinance a parcel of real property located at 9671 Janet Rose Court, Manassas, Virginia 20111 ("Janet Rose Property"). The Conspirators misrepresented to Wells Fargo that the Janet Rose Note was secured by a deed of trust in "first lien" position on the Janet Rose Property. Khan of TitlePro served as the title agent for the Janet

Rose Transaction and notarized the deed of trust on the Janet Rose Property. On information and belief, TitlePro prepared the deed of trust used in the Janet Rose Transaction.

121.    TitlePro generated a HUD settlement statement for the Janet Rose Transaction on September 20, 2007. The HUD settlement statement listed one prior recorded mortgage on the Janet Rose Property held by GMAC Mortgage Corporation in the amount of $495,856.23. The HUD settlement statement further indicated that this encumbrance would be paid-off with the proceeds of the Janet Rose Note. The HUD settlement statement identifies TitlePro as the settlement agent for the Janet Rose Transaction and lists three "TITLE CHARGES" paid to TitlePro.

122.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Janet Rose Transaction to Financial Mortgage Inc. and its successors and assigns as their interests may appear.

123.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Janet Rose Transaction, to provide title insurance coverage to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the Janet Rose Transaction is confirmed in the HUD settlement statement for the Janet Rose Transaction, which reflects that the borrower paid $1,250.00 to Old Republic for title insurance coverage in the amount of $500,000.00.

124.    The HUD settlement statement prepared by TitlePro pursuant to the Janet Rose Transaction failed to list a lien filed in the Prince William County land records on September 20, 2006 to secure a $500,000.00 note issued by First National Bank of Arizona on September 15, 2006 as instrument no. 200609200136370. According to the deed of trust filed in the Prince

William County land records, TitlePro served as the title agent for the First National Bank of Arizona transaction involving the Janet Rose Property.

125.    On or about January 21, 2009, Aurora Loan Services foreclosed on the lien filed on behalf of First National Bank of Arizona in the Prince William County land records to secure First National Bank of Arizona's $500,000.00 note.

126.    The MERS system reflects that Franklin Bank, SSB registered a mortgage on the Janet Rose Property on November 14, 2007 in the amount of $500,000.00 (the exact same amount as the Armada Place Note that Wells Fargo purchased from FMI). On information and belief, the Conspirators sold the Janet Rose Note to more than one financial institution on the secondary mortgage market.

127.    TitlePro did not record a deed of trust in the Prince William County land records for Wells Fargo's Janet Rose Note. Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position on the Janet Rose Property and the property has been foreclosed, Wells Fargo's Janet Rose Note is not secured by an interest in the Janet Rose Property. The current outstanding principal and interest on the Janet Rose Note — which was supposed to be (but was not) secured by a first lien on the Janet Rose Property — is $529,166.70.

### 3446 Caledonia Circle, Woodbridge, Virginia 22192

128.    On January 16, 2008, FMI sold Wells Fargo a $312,000.00 note ("Caledonia Circle Note"). Loan records indicate that the Caledonia Circle Note was issued on November 30, 2007 pursuant to a transaction ("Caledonia Circle Transaction") to refinance a parcel of real property located at 3446 Caledonia Circle, Woodbridge, Virginia 22192 ("Caledonia Circle Property"). The Conspirators misrepresented to Wells Fargo that the Caledonia Circle Note was

secured by a deed of trust in "first lien" position on the Caledonia Circle Property. TitlePro served as the title agent for the Caledonia Circle Transaction and Khan notarized the deed of trust on the Caledonia Circle Property. On information and belief, TitlePro prepared the deed of trust used in the Caledonia Circle Transaction.

129.   TitlePro generated a HUD settlement statement for the Caledonia Circle Transaction on November 30, 2007. The HUD settlement statement listed one prior recorded mortgage on the Caledonia Circle Property held by Countrywide Home Loans in the amount of $279,334.78. The HUD settlement statement failed to reflect another prior deed of trust on the Caledonia Circle Property. The omitted prior deed of trust on the Caledonia Circle Property was recorded in the land records for Prince William County on June 24, 2005, as instrument no. 200506270104353 and it secured a note issued by Wells Fargo for $283,500.00.

130.   The HUD settlement statement characterizes the Caledonia Circle Transaction as a "refinance," identifies TitlePro as the settlement agent for the Caledonia Circle Transaction and lists eight "TITLE CHARGES" paid to TitlePro. The prior-existing Wells Fargo note for $283,500.00 was not satisfied as part of the Caledonia Circle Transaction.

131.   On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Caledonia Circle Transaction to Financial Mortgage Inc. and its successors and assigns as their interests may appear.

132.   On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Caledonia Circle Transaction to provide title insurance coverage to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the Caledonia Circle Transaction is confirmed in the HUD settlement

statement for the Caledonia Circle Transaction, which reflects that the borrower paid $798.00 to Old Republic for title insurance coverage in the amount of $312,000.00.

133. Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position on the Caledonia Circle Property, Wells Fargo's Caledonia Circle Note is not properly secured by an interest in the Caledonia Circle Property. The current outstanding principal and interest on the Caledonia Circle Note — which was supposed to be (but was not) secured by a first lien on the Caledonia Circle Property — is $330,732.90.

### 2827 Wake Water Way, Woodbridge, Virginia 22191

134. On December 26, 2007, FMI sold Wells Fargo a $417,000.00 note ("Wake Water Note"). Loan records indicate that the Wake Water Note was issued on September 17, 2007 pursuant to a transaction ("Wake Water Transaction") to refinance a parcel of real property located at 2827 Wake Water Way, Woodbridge, Virginia 22191 ("Wake Water Property"). The Conspirators misrepresented to Wells Fargo that the Wake Water Note was secured by a deed of trust in "first lien" position on the Wake Water Property. TitlePro served as the title agent for the Wake Water Transaction and Khan notarized the deed of trust on the Wake Water Property. On information and belief, TitlePro prepared the deed of trust used in the Wake Water Transaction.

135. TitlePro generated a HUD settlement statement for the Wake Water Transaction on September 17, 2007. The HUD settlement statement listed one prior recorded mortgage on the Wake Water Property and indicated that $413,945.00 of the proceeds from the Wake Water Note would be used to satisfy that prior lien. The Prince William County land records reflect two deeds of trust for the Wake Water Property at the time of the Wake Water Transaction — a deed of trust filed by Harbourton Mortgage Investment Corporation on December 20, 2006 to

secure a $417,000.00 note and a deed of trust filed by Bank of America, NA on May 7, 2007 to secure a $33,000 note.

136.    The HUD settlement statement characterizes the Wake Water Transaction as a "refinance," identifies TitlePro as the settlement agent for the Wake Water Transaction, and lists three "TITLE CHARGES" paid to TitlePro.

137.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter regarding the Wake Water Transaction to Financial Mortgage Inc. and its successors and assigns as their interests may appear.

138.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Wake Water Transaction to provide title insurance coverage to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the Wake Water Transaction is confirmed in the HUD settlement statement for the Wake Water Transaction, which reflects that the borrower paid $1050.80 to Old Republic for title insurance coverage in the amount of $417,000.00.

139.    The deed of trust reflected that the Wake Water Transaction was a "refinance" and the HUD settlement statement reflected that the proceeds of FMI's note were to be used to pay down a prior existing mortgage. Nevertheless, TitlePro did not use the proceeds of the Wake Water Note to satisfy the prior existing deeds of trust filed by Harbourton Mortgage Investment Corporation and Bank of America NA. On information and belief, TitlePro instead transferred the proceeds of the Wake Water Note to FMI pursuant to the Conspiracy.

140.    TitlePro never recorded a deed of trust in the Prince William County land records for the Wake Water Note that FMI issued pursuant to the Wake Water Transaction. On or about September 30, 2008, Aurora Loan Services, LLC foreclosed the Wake Water Property acting

pursuant to Harbourton Mortgage Investment Corporation deed of trust on the Wake Water Property.

141.    Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position on the Wake Water Property and the property has been foreclosed, Wells Fargo's Wake Water Note is not secured by an interest in the Wake Water Property. The current outstanding principal and interest on the Wake Water Note — which was supposed to be (but was not) secured by a first lien on the Wake Water Property — is $441,916.84.

### 17588 Victoria Falls Drive, Dumfries, Virginia 22025

142.    On March 4, 2008, FMI sold Wells Fargo a $386,000.00 note ("Victoria Falls Note"). Loan records indicate that the Victoria Falls Note was issued on February 13, 2008 pursuant to a transaction ("Victoria Falls Transaction") to refinance a parcel of real property located at 17588 Victoria Falls Drive, Dumfries, Virginia 22025 ("Victoria Falls Property"). The Conspirators misrepresented to Wells Fargo that the Victoria Falls Note was secured by a deed of trust in "first lien" position on the Victoria Falls Property. TitlePro served as the title agent for the Victoria Falls Transaction and Khan notarized the deed of trust on the Victoria Falls Property. On information and belief, TitlePro prepared the deed of trust used in the Victoria Falls Transaction.

143.    TitlePro generated a HUD settlement statement for the Victoria Falls Transaction on February 13, 2008. The HUD settlement statement listed one prior recorded mortgage on the Victoria Falls Property — a mortgage held by Wells Fargo Home Mortgage in the amount of $387,954.78 — and indicated that proceeds from the Victoria Falls Note would be used to satisfy that prior lien. The Prince William County land records, however, reflect two additional deeds of trust for the Victoria Falls Property at the time of the Victoria Falls Transaction. The

Prince William County land records reflect that EMC Mortgage Corporation filed two deeds of trust on July 3, 2006 to secure two notes that EMC Mortgage Corporation issued on June 30, 2006 in the amounts of $320,000.00 and $60,000.00.

144.    The MERS system reflects that Franklin Bank, SSB registered an additional mortgage on the Victoria Falls Property on February 13, 2008 (the date of the Victoria Falls Note that Wells Fargo purchased from FMI) in the amount of $386,000.00 (the exact same amount as the Victoria Falls Note that Wells Fargo purchased from FMI). On information and belief, the Conspirators sold the same Victoria Falls Note to more than one financial institution in the secondary mortgage market.

145.    The HUD settlement statement characterizes the Victoria Falls Transaction as a "refinance," identifies TitlePro as the settlement agent for the Victoria Falls Transaction and lists three "TITLE CHARGES" paid to TitlePro. Nevertheless, TitlePro did not use the proceeds from the Victoria Falls Note to satisfy the mortgages filed by EMC Mortgage Corporation.

146.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter to Financial Mortgage Inc. and its successors and assigns as their interests may appear.

147.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Victoria Falls Transaction to provide title insurance coverage to Financial Mortgage and its successors and/or assigns. Old Republic's issuance of title insurance for the Victoria Falls Transaction is confirmed in the HUD settlement statement for the Victoria Falls Transaction, which reflects that the borrower paid $976.40 to Old Republic for title insurance coverage in the amount of $386,000.00.

148. TitlePro never recorded a deed of trust in the Prince William County land records for the Victoria Falls Note that FMI issued pursuant to the Victoria Falls Transaction. On or about September 28, 2008, Federal Home Loan Mortgage Corporation foreclosed the Victoria Falls Property acting pursuant to EMC Mortgage Corporation's deeds of trust on the Victoria Falls Property.

149. Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position on the Victoria Falls Property and the property has been foreclosed, Wells Fargo's Victoria Falls Note is not secured by an interest in the Victoria Falls Property. The current outstanding principal and interest on the Victoria Falls Note — which was supposed to be (but was not) secured by a first lien on the Victoria Falls Property — is $407,230.00.

### 5335 Summit Drive, Fairfax, Virginia 22030

150. On February 8, 2007, FMI sold Wells Fargo a $2,950,000.00 note ("Summit Drive Note"). Loan records indicate that Summit Drive Note was issued on January 25, 2007 pursuant to a transaction ("Summit Drive Transaction") to refinance a parcel of real property owned by Taneja and located at 5335 Summit Drive, Fairfax, Virginia 22030 ("Summit Drive Property"). The Conspirators misrepresented to Wells Fargo that the Summit Drive Note was secured by a deed of trust in "first lien" position on the Summit Drive Property. TitlePro served as the title agent for the Summit Drive Transaction. On information and belief, TitlePro prepared the deed of trust used in the Summit Drive Transaction.

151. A HUD settlement statement was generated for the Summit Drive Transaction on January 25, 2007. The HUD settlement statement characterizes the Summit Drive Property as a "refinance," identifies TitlePro as the settlement agent for the Summit Drive Transaction and lists eight "TITLE CHARGES" paid to TitlePro.

152.    On January 26, 2007, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter to Financial Mortgage Inc. regarding the Summit Drive Transaction. The closing protection letter lists Khan as the "AGENT CONTACT."

153.    Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Summit Drive Transaction, Commitment No. TP070106 for ALTA Loan Policy (10-17-92) to provide title insurance coverage to FMI, and its successors or assigns as their interests may appear, effective January 8, 2007. Old Republic's issuance of title insurance for the Summit Drive Transaction is confirmed in the HUD settlement statement for the Summit Drive Transaction, which reflects that Taneja paid $6,150.00 to Old Republic for title insurance coverage in the amount of $2,950,000.00.

154.    The MERS system reflects that there are at least five active mortgages, in addition to Wells Fargo's mortgage for the Summit Drive Note, for the Summit Drive Property — a $1,000,000.00 mortgage with Select Portfolio Servicing Inc. registered October 29, 2003; a $125,000.00 mortgage with Wilshire Credit Corp. registered October 29, 2003; a $2,950,000.00 mortgage (the exact same amount as the Summit Drive Note that Wells Fargo purchased from FMI) with Residential Funding Company, LLC registered on January 25, 2007 (the date of the Summit Drive Note that Wells Fargo purchased from FMI); a $2,950,000.00 mortgage with EMC Mortgage Corporation registered on January 25, 2007; and a $2,950,000.00 mortgage with Chevy Chase Bank, FSB registered on January 25, 2007. On information and belief, FMI and its co-conspirators sold the same Summit Drive Note to multiple financial institutions on the secondary mortgage market.

155.    By order of the bankruptcy court, the Summit Drive Property was sold at auction on November 20, 2008. Wells Fargo has asserted a claim to the proceeds, along with Chevy

Chase Bank, EMC Mortgage Company, GMAC Mortgage Company, and MidFirst Mortgage Co., that is pending before the bankruptcy court. Even if Wells Fargo's claim is successful, Wells Fargo is unlikely to recoup its losses.

156.   TitlePro never recorded a deed of trust in the Fairfax County land records for the Summit Drive Note that FMI issued pursuant to the Summit Drive Transaction.

157.   Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position on the Summit Drive Property, Wells Fargo's Summit Drive Note is not properly secured by an interest in the Summit Drive Property. The current outstanding principal and interest on the Summit Drive Note — which was supposed to be (but was not) secured by a first lien on the Summit Drive Property — is $2,973,882.30.

### 7918 Edinburgh Drive, Springfield, Virginia 22153

158.   On January 24, 2008, FMI sold Wells Fargo a $417,000.00 note ("Edinburgh Drive Note"). Loan records indicate that the Edinburgh Drive Note was issued on August 17, 2007 pursuant to a transaction ("Edinburgh Drive Transaction") involving Taneja's sale of a parcel of real property located at 7918 Edinburgh Drive, Springfield, Virginia 22153 ("Edinburgh Drive Property"). The Conspirators misrepresented to Wells Fargo that the Edinburgh Drive Note was secured by a deed of trust in "first lien" position on the Edinburgh Drive Property. Khan of TitlePro served as the title agent for the Edinburgh Drive Transaction and notarized the Edinburgh Drive Note and the deed of trust on the Edinburgh Drive Property. On information and belief, TitlePro prepared the deed of trust used in the Edinburgh Drive Transaction.

159.   TitlePro generated a HUD settlement statement for the Edinburgh Drive Transaction on August 17, 2007. The HUD settlement statement listed a prior recorded

mortgage on the Edinburgh Drive Property held by FMI in the amount of $472,000.00. The HUD settlement statement further indicated that this encumbrance would be paid off with the proceeds of the Edinburgh Drive Note. The HUD settlement statement identifies TitlePro as the settlement agent for the Edinburgh Drive Transaction and lists four "TITLE CHARGES" paid to TitlePro.

160.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter to Financial Mortgage Inc. and its successors and assigns as their interests may appear regarding the Edinburgh Drive Transaction.

161.    Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Edinburgh Drive Transaction, Commitment No. PP-080725 for ALTA Loan Policy (10-17-92), to provide insurance coverage in the amount of $417,000.00 to Financial Mortgage and its successors and/or assigns effective August 9, 2007. Old Republic's issuance of title insurance for the Edinburgh Drive Transaction is confirmed in the HUD settlement statement for the Edinburgh Drive Transaction, which reflects that the borrower paid $1050.80 to Old Republic for title insurance coverage in the amount of $417,000.00.

162.    The deed of trust for the Edinburg Drive Property reflected that the Edinburgh Drive Transaction was a real estate sale and the HUD settlement statement reflected that the proceeds of the Edinburgh Drive Note were to be used to pay-off FMI's prior existing mortgage. Nevertheless, TitlePro did not use the proceeds of the Edinburg Drive Note to satisfy the prior existing FMI deed of trust.

163.    The MERS system reflects that Franklin Bank, SSB registered an additional mortgage on the Edinburg Drive Property on December 7, 2007 in the amount of $417,000 (the exact same amount as the Edinburg Drive Note that Wells Fargo purchased from FMI). On

information and belief, the Conspirators sold the same Edinburg Drive Note to more than one financial institution in the secondary mortgage market.

164.    Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position, Wells Fargo's Edinburgh Drive Note is not properly secured by an interest in the Edinburgh Drive Property.  The current outstanding principal and interest on the Edinburgh Drive Note — which was supposed to be (but was not) secured by a first lien on the Edinburgh Drive Property — is $436,460.00.

### 15009 Lutz Court, Woodbridge, Virginia  22193

165.    On September 18, 2007, FMI sold Wells Fargo a $417,000.00 note ("Lutz Court Note").  Loan records indicate that the Lutz Court Note was issued on August 17, 2007 pursuant to a transaction ("Lutz Court Transaction") involving Taneja's sale of a parcel of real property located at 15009 Lutz Court, Woodbridge, Virginia  22193 ("Lutz Court Property").  The Conspirators misrepresented to Wells Fargo that the Lutz Court Note was secured by a deed of trust in "first lien" position on the Lutz Court Property.  Khan of TitlePro served as the title agent for the Lutz Court Transaction and notarized the Lutz Court Note and the deed of trust on the Lutz Court Property.  On information and belief, TitlePro prepared the deed of trust used in the Lutz Court Transaction.

166.    TitlePro generated a HUD settlement statement for the Lutz Court Transaction on August 17, 2007.  The HUD settlement statement listed a prior recorded mortgage on the Lutz Court Property held by FMI in the amount of $464,000.00.  The HUD settlement statement further indicated that this encumbrance would be paid-off with the proceeds of the Lutz Court Note.  The HUD settlement statement identifies TitlePro as the settlement agent for the Lutz

Court Transaction and lists three "TITLE CHARGES" paid to TitlePro (and one "TITLE CHARGE" paid to Old Republic for "title insurance").

167.    On information and belief, Old Republic, acting through its agents TitlePro and/or Khan, issued a closing protection letter to Financial Mortgage Inc. and its successors and assigns as their interests may appear.

168.    Old Republic, acting through its agents TitlePro and/or Khan, issued a title commitment for the Lutz Court Transaction, Commitment No. PP-080724 for ALTA Loan Policy (10-17-92), to provide insurance coverage in the amount of $476,000.00 to FMI and its successors and/or assigns effective August 6, 2007.  Old Republic's issuance of title insurance for the Lutz Court Transaction is confirmed in the HUD settlement statement for the Edinburgh Drive Transaction, which reflects that the borrower paid $1050.80 to Old Republic for title insurance coverage in the amount of $417,000.00.

169.    The deed of trust for the Lutz Court Transaction reflected that the Lutz Court Transaction was a real estate sale and the HUD settlement statement reflected that the proceeds of the Lutz Court Note were to be used to pay-off FMI's prior existing mortgage.  Nevertheless, TitlePro did not use the proceeds of the Lutz Court Note to pay-off FMI's prior existing mortgage.

170.    The MERS system reflects that Franklin Bank, SSB registered an additional mortgage on the Lutz Court Property on December 7, 2007 in the amount of $417,000.00 (the exact same amount as the Lutz Court Note that Wells Fargo purchased from FMI).  On information and belief, the Conspirators sold the same Lutz Court Note to more than one financial institution in the secondary mortgage market.

171.   Because Wells Fargo's deed of trust does not occupy a recorded and perfected first lien position, Wells Fargo's Lutz Court Note is, in effect, not properly secured by an interest in the Lutz Court Property.  The current outstanding principal and interest on the Lutz Court Note — which was supposed to be (but was not) secured by a first lien on the Lutz Court Property — is $441,325.00.

### FIRST CLAIM FOR RELIEF
### (Breach Of Contract)

172.   Wells Fargo re-alleges and incorporates paragraphs 1 through 171 of this complaint as though fully set forth herein.

173.   The title commitment, title insurance policy and closing protection letter that Old Republic issued for each of the Virginia Properties together constitute one valid and enforceable contract.

174.   Wells Fargo became entitled to coverage under the title commitments, title insurance policies and closing protection letters that Old Republic issued through TitlePro regarding the Virginia Properties when Wells Fargo purchased the notes that were the subject of those title commitments, title insurance policies, and closing protection letters and FMI assigned all its interests therein to Wells Fargo.

175.   Wells Fargo purchased each of the notes at issue in this case from FMI for value and without knowledge of the defects, liens, encumbrances, adverse claims and other matters that deprived Wells Fargo of its promised first-lien security interest in the Virginia Properties. Accordingly, Wells Fargo possesses FMI's rights under the title commitments, title insurance policies and closing protection letters that Old Republic issued to FMI regarding the Virginia Properties.  Moreover, Wells Fargo, as a purchaser for value without knowledge of defects to

title, is not subject to any rights or defenses under the title commitments, title insurance policies, and closing protection letters that Old Republic may have had against FMI.

176. On information and belief, all premiums due under the title commitments, title insurance policies and closing protection letters have been paid and all obligations and conditions, whether express or implied, under the title commitments, title insurance policies and closing protection letters either have been satisfied or were not satisfied solely because of, and as a direct result of, the defalcations and/or failures of TitlePro.

177. Wells Fargo has been deprived of a "first lien" security interest in each of the Virginia Properties.

178. As described in paragraphs 47 to 171, Wells Fargo has suffered loss or damage, including but not limited to loss and damage due to the undisclosed and unsatisfied encumbrances on the titles for the Virginia Properties, the unenforceability of its liens on the Virginia Properties, and the priority of other liens over Wells Fargo's liens on the Virginia Properties.

179. Wells Fargo has also been harmed by TitlePro's failure to comply with the written closing instructions reflected in the HUD settlement statements and other documents related to the transactions at issue in this case involving the Virginia Properties. TitlePro's failures have adversely affected the status of the title to each of the Virginia Properties, Wells Fargo's security interest in the title to each of the Virginia Properties, and the validity, enforceability and priority of Wells Fargo's lien on each of the Virginia properties. TitlePro's failures included, but were not limited to, failures in performing and reporting the results of title searches, failures to record title instruments in the land records, and failures regarding the disbursement of funds necessary to establish Wells Fargo's security interest in the title to each of the Virginia Properties.

180.    Wells Fargo has also been harmed by TitlePro's fraud and dishonesty in handling funds or documents in connection with such closings. TitlePro's fraud or dishonesty relates to the status of the title to the Virginia Properties and to the validity, enforceability and priority of Wells Fargo's lien on the title of each of the Virginia Properties.

181.    Wells Fargo's damages and injuries are covered by the terms of the title commitments, title insurance policies and closing protection letters issued by Old Republic (through TitlePro) for the transactions at issue in this case involving the Virginia Properties. As a result, Old Republic is obligated to compensate Wells Fargo for the damages and losses that Wells Fargo incurred with respect to the Virginia Properties.

182.    Wells Fargo has submitted proof of its damages and losses to Old Republic.

183.    Old Republic has refused to honor its obligations to Wells Fargo under the title commitments, title insurance policies and closing protection letters that Old Republic issued through TitlePro. As a result, Old Republic is in breach of the title commitments, title insurance policies and closing protection letters it issued through TitlePro, and Old Republic's breaches have directly and proximately deprived, and threaten to further deprive, Wells Fargo of the insurance coverage for which Old Republic was paid substantial premiums.

184.    Old Republic's breach of the title commitments, title insurance policies and closing protection letters it issued through TitlePro have also caused reasonably foreseeable consequential harm to Wells Fargo. These consequential harms include, without limitation, the attorneys' fees and expenses involved in the prosecution of this action, interest lost on the notes and the amounts due under the policies, and other lost earnings on amounts due under the notes and under the policies.

## SECOND CLAIM FOR RELIEF
### (Business Conspiracy in Violation of Va. Code. § 18.2-499)

185.    Wells Fargo re-alleges and incorporates paragraphs 1 through 184 of this complaint as though fully set forth herein.

186.    FMI, Taneja, TitlePro, and Khan combined, associated, agreed, mutually undertook and acted in concert together for the purpose of defrauding financial institutions, including Wells Fargo, in the secondary loan market.

187.    In executing this conspiracy to defraud financial institutions such as Wells Fargo in the secondary mortgage market, the Conspirators acted intentionally, purposefully, and without lawful justification.

188.    Because of the Conspiracy, every act committed in furtherance of the conspiracy is imputed to each and every Conspirator.

189.    Wells Fargo has been injured by the Conspiracy in its trade, business, and profession. Among other damages sustained by Wells Fargo, Wells Fargo was induced by fraud to purchase notes that were, in effect, unsecured and that are unlikely to be honored by many, if not all, of the borrowers. Wells Fargo has been deprived also of a "first-lien" security interest in each of the Virginia Properties. Further, Wells Fargo has suffered consequential injuries as a result of the conspiracy, including without limitation, the attorneys' fees and expenses involved in the prosecution of this action, interest lost on the notes, and other lost earnings on amounts due under the notes.

190.    The actions of FMI, Taneja, TitlePro, and Khan constitute a combination to injure others in their reputation, trade, business or profession in violation of Va. Code § 18.2-499.

191.    FMI, Taneja, TitlePro, and Khan are jointly and severally liable for the injury caused to Wells Fargo by the conspiracy.

192.  Old Republic is bound by the representations made by TitlePro and Khan — and is liable for the harms caused as a result of the fraud perpetrated by TitlePro and Khan — because TitlePro and Khan acted with Old Republic's actual and/or apparent authority for the full duration and scope of the Conspiracy.

### THIRD CLAIM FOR RELIEF
### (Common Law Civil Conspiracy)

193.  Wells Fargo re-alleges and incorporates paragraphs 1 through 192 of this complaint as though fully set forth herein.

194.  FMI, Taneja, TitlePro, and Khan combined, associated, agreed, mutually undertook, and acted in concert together for the unlawful purpose of defrauding financial institutions, including Wells Fargo, in the secondary loan market.

195.  FMI, Taneja, TitlePro, and Khan each committed numerous acts in furtherance of the Conspiracy, including the acts set forth above in this complaint. Moreover, each Conspirator committed unlawful acts in furtherance of the conspiracy. Because of the Conspiracy, every act committed in furtherance of the conspiracy is imputed to each and every Conspirator.

196.  Wells Fargo has been injured by the Conspiracy in its trade, business, and profession. Among other damages sustained by Wells Fargo, Wells Fargo was induced by fraud to purchase notes that were, in effect, unsecured. Wells Fargo has been deprived also of a "first-lien" security interest in each of the Virginia Properties. Further, Wells Fargo has suffered consequential injuries as a result of the conspiracy. Wells Fargo's consequential injuries include, without limitation, the attorneys' fees and expenses involved in the prosecution of this action, interest lost on the notes, and other lost earnings on amounts due under the notes.

197.  FMI, Taneja, TitlePro, and Khan are jointly and severally liable for the injury caused to Wells Fargo by the Conspiracy.

198.    Old Republic is bound by the representations made by TitlePro and Khan — and is liable for the harms caused as a result of the Conspiracy in which TitlePro and Khan participated — because TitlePro and Khan acted with Old Republic's actual and/or apparent authority when they crafted the misrepresentations alleged in this complaint and for the entire time that they participated in the Conspiracy.

199.    Old Republic is liable for the harms caused as a result of the conspiracy because TitlePro and Khan acted with Old Republic's actual and/or apparent authority for the full duration and scope of the Conspiracy.

## FOURTH CLAIM FOR RELIEF
### (Fraud)

200.    Wells Fargo re-alleges and incorporates paragraphs 1 through 199 of this complaint as though fully set forth herein.

201.    The Conspirators, including TitlePro and Khan, represented to Wells Fargo, among other things, that each of the notes that Wells Fargo purchased was secured by a deed of trust in "first-lien" position on the Virginia Property referenced in the note. This representation, among other representations made by the Conspirators, was false. None of the notes at issue in this case were secured by a deed of trust in "first-lien" position on one of the Virginia Properties.

202.    The Conspirators' misrepresentations to Wells Fargo, including misrepresentations specifically made by TitlePro and Khan, were material. For example, the notes purchased by Wells Fargo would be substantially more valuable if they were secured (as TitlePro, Khan and the other co-conspirators represented) by a deed of trust in "first-lien" position on one of the Virginia Properties. In fact, some or all of the notes Wells Fargo purchased may be worthless because they are, in effect, unsecured.

203.    The Conspirators' misrepresentations to Wells Fargo, including misrepresentations specifically made by TitlePro and Khan, were made intentionally and knowingly. Among other things, TitlePro, Khan, and their co-conspirators: intentionally and knowingly omitted prior encumbrances from HUD settlement statements and other settlement-related documents; intentionally and knowingly misrepresented that prior encumbrances would be satisfied with settlement proceeds; intentionally and knowingly used settlement proceeds for other purposes; intentionally and knowingly falsified loan and title documents; intentionally and knowingly failed to record deeds of trust and other documents in county land records to obfuscate the Conspirators' activities; and intentionally and knowingly sold multiple fraudulent notes allegedly secured by first-position liens on the same property.

204.    TitlePro, Khan, and the other Conspirators intended to mislead Wells Fargo and other financial institutions in the secondary loan market.

205.    Wells Fargo relied on the Conspirators' misrepresentations, including misrepresentations made specifically by TitlePro and Khan, when it purchased the notes at issue in this case in the secondary loan market. Had Wells Fargo known that the notes at issue in this case were not secured by deeds of trust in first-lien position on the Virginia Properties, it would not have purchased those notes.

206.    Wells Fargo has been injured by the fraud perpetrated by TitlePro, Khan, and the other Conspirators. Among other damages sustained by Wells Fargo, Wells Fargo was induced by fraud to purchase notes that were, in effect, unsecured and has been deprived of a "first-lien" security interest in each of the Virginia Properties. In addition, Wells Fargo has suffered consequential injuries as a result of the fraud, including without limitation, the attorneys' fees

and expenses involved in the prosecution of this action, interest lost on the notes, and other lost earnings on amounts due under the notes.

207.   Old Republic is bound by the representations made by TitlePro and Khan — and is liable for the harms caused as a result of the fraud perpetrated by TitlePro and Khan — because TitlePro and Khan acted with Old Republic's actual and/or apparent authority when they perpetrated their fraudulent acts against Wells Fargo.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Wet Settlement Act, Va. Code § 6.1-2.13)

208.   Wells Fargo re-alleges and incorporates paragraphs 1 through 207 of this complaint as though fully set forth herein.

209.   TitlePro and Khan, acting pursuant to the Conspiracy, committed numerous violations of the Wet Settlement Act, Va. Code § 6.1-2.13.

210.   TitlePro and Khan, acting pursuant to the Conspiracy, failed to cause recordation of deeds, deeds of trusts, mortgages and/or other documents regarding the Virginia Properties within two business days of settlement.

211.   TitlePro and Khan, acting pursuant to the Conspiracy,  failed to disburse settlement proceeds to satisfy and remove liens or encumbrances as specified and described in HUD settlement statements and other documents related to the titles to the Virginia Properties within two business days of settlement.

212.   TitlePro and Khan, acting pursuant to the Conspiracy, disbursed loan funds and other funds coming into their possession prior to recording deeds, deeds of trusts, mortgages and/or other documents related to the titles to the Virginia Properties.  The funds disbursed by TitlePro and Khan were not overpayments, funds necessary to effect the recordation of

instruments, or funds which the provider by separate written instrument directed to be disbursed prior to the recordation of any instrument.

213.    Wells Fargo has been harmed by TitlePro's and Khan's violations of the Wet Settlement Act because these violations have deprived some or all of Wells Fargo's deeds of trust of "first lien" priority. Accordingly, Wells Fargo is entitled to the relief set forth in Va. Code Ann. § 6.1-2.15, including actual damages and attorneys' fees.

214.    Old Republic is liable for the harms caused by TitlePro's and Khan's violations of the Virginia Wet Settlement Act because TitlePro and Khan acted with Old Republic's actual and/or apparent authority when they perpetrated their violations and thereby harmed Wells Fargo.

**SIXTH CLAIM FOR RELIEF**
**(Negligence)**

215.    Wells Fargo re-alleges and incorporates paragraphs 1 through 214 of this complaint as though fully set forth herein.

216.    TitlePro and Khan, as settlement agents in the Commonwealth of Virginia, were under a duty to use reasonable care in performing their responsibilities as title agents. TitlePro's and Khan's responsibilities included, but were not limited to, issuing title insurance, recording title instruments (such as deeds, deeds of trust, mortgages and other title-related documents), performing record searches, reporting the results of record searches, preparing title and closing documents, and receiving and disbursing funds.

217.    As alleged in this complaint, TitlePro and Khan breached their duty to use reasonable care in performing these responsibilities. For example, TitlePro's and Khan's breaches of their duty to use reasonable care included, but were not limited to, failing to disclose the existence of encumbrances on the Virginia Properties that had been duly recorded in county

land records, failing to record deeds of trust in county land records, and failing to use settlement proceeds to pay down title encumbrances as reflected in HUD settlement statements.

218.    Wells Fargo was injured by TitlePro's and Khan's breaches of their duties as title agents because the breaches created the false impression that the notes purchased by Wells Fargo were secured by valid deeds of trust on the Virginia Properties with "first lien" priority. Had Wells Fargo known that the notes it purchased were not secured by valid deeds of trust on the Virginia Properties with "first lien" priority, Wells Fargo would not have purchased the notes.

219.    TitlePro's and Khan's breaches of their duties as title agents proximately caused Wells Fargo's injuries. It was foreseeable that Wells Fargo or another similar financial institution in the secondary mortgage market would rely upon the title-related documents prepared by TitlePro and Khan in deciding to purchase notes in the secondary mortgage market. It was similarly foreseeable that Wells Fargo or another similar financial institution in the secondary mortgage market would trust that TitlePro and Khan executed their settlement-related duties by, among other things, accurately noting prior recorded encumbrances to title, recording title-related documents, and paying off prior encumbrances in accordance with the HUD settlement statement for the transaction.

220.    Old Republic is liable for the harms caused by TitlePro's and Khan's negligence because TitlePro and Khan acted with Old Republic's actual and/or apparent authority when they committed their negligent acts and thereby harmed Wells Fargo.

## REQUEST FOR RELIEF

WHEREFORE, Wells Fargo requests that judgment be entered in favor of Wells Fargo and against Old Republic on Wells Fargo's claims as follows:

a. An award of all damages incurred by Wells Fargo, which include amounts equal to the current outstanding principal and interest on the 17 notes described herein and additional amounts to be proven at trial;

b. An award of treble damages and attorneys' fees pursuant to Va. Code § 18.2-500;

c. An award of double interest and attorneys' fees pursuant to Va. Code § 6.1-2.15;

d. An award of all other appropriate exemplary damages;

e. An award of all recoverable interest;

f. An award of all the costs and expenses of suit incurred by Wells Fargo herein; and

g. An award for such other and further relief as this Court deems just and proper.

Dated: March 18, 2009

Respectfully submitted,

By: _William E. Copley_

William E. Copley
Va. Bar No. 43960
Attorney for Plaintiff Wells Fargo Bank, N.A.
**GILBERT OSHINSKY LLP**
1100 New York Avenue NW
Suite 700
Washington, D.C. 20005
Telephone:  (202) 772-2200
Facsimile:  (202) 772-1924
copleyw@gotofirm.com

## JURY REQUEST

Wells Fargo hereby requests trial by jury.