**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| WELLS FARGO BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09-cv-00297-CMH-TRJ |
| | ) | |
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF WELLS FARGO BANK, N.A.'S OPPOSITION TO
DEFENDANT OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

William E. Copley (Va. Bar No. 43960)
August J. Matteis, Jr.
Derek Y. Sugimura
GILBERT LLP
1100 New York Avenue, N.W.
Suite 700
Washington, D.C.  20005-6133
Telephone: (202) 772-2200
Facsimile: (202) 772-3333

*Attorneys for Plaintiff Wells Fargo Bank, N.A.*

Dated: October 16, 2009

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ......................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .......................................................... 3

I.    Old Republic's Agency Relationship with TitlePro and Khan .......................... 3

      A.    Old Republic's Pre-Appointment Evaluation of Khan ........................... 3

      B.    Old Republic's Agency Agreement with TitlePro and Khan ................. 4

      C.    Old Republic's Control Over TitlePro's and Khan's Settlement and Escrow
            Activities ........................................................................................ 5

      D.    Old Republic's Representations to the Public Regarding the Scope of
            TitlePro's and Khan's Agency .......................................................... 6

II.   TitlePro's and Khan's Conspiracy with FMI and Taneja .................................. 6

III.  The Notes, Transactions, and Properties at Issue ............................................. 7

IV.   Wells Fargo's Reliance upon Khan's and TitlePro's Misrepresentations. ....... 11

ARGUMENT ............................................................................................... 11

I.    Old Republic is Liable for the Acts of Its Agents, TitlePro and Khan. ............ 11

      A.    By Virginia Statute, TitlePro and Khan are Old Republic's Agents for
            Purposes of Wells Fargo's Claims. .................................................. 12

      B.    TitlePro and Khan Used Old Republic's Admitted Actual  Authority to
            Further the Conspiracy. ................................................................. 14

      C.    TitlePro and Khan are Old Republic's Common Law Agents. ............. 15

      D.    Old Republic is Liable for TitlePro's and Khan's Wrongdoings Because It
            Made Those Wrongdoings Possible. ................................................ 17

II.   Wells Fargo's Claim for Breach of Contract is Legally and Factually Sound. ... 18

      A.    FMI's Fraud is No Bar to Wells Fargo's Contract Claim. ................... 19

      B.    The Defalcations of Old Republic's Agents, TitlePro and Khan, are No Bar
            to Wells Fargo's Contract Claim. .................................................... 21

III.    Wells Fargo has Ample Evidence that it Relied Upon and was Injured by TitlePro's
        and Khan's Misrepresentations to Support its Fraud Claim. ........................................... 22

IV.     Wells Fargo's Claim for Violation of the Wet Settlement Act is Legally and
        Factually Sound. ........................................................................................................... 27

V.      Wells Fargo's Negligence Claim is Legally and Factually Sound. .................................. 27

VI.     Wells Fargo's Claims Arising Out of the Summit Drive Transaction are Legally
        and Factually Sound.......................................................................................................... 28

        CONCLUSION.................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*American General Insurance Co. v. Equitable General Corp.*,
    493 F. Supp. 721 (E.D. Va. 1980) ........................................................26

*Amerifirst Savings Bank of Xenia Ohio v. Krug*,
    737 N.E.2d 68 (Ohio Ct. App. 1999) ...................................................24

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................29

*Bank of Montreal v. Signet Bank*,
    193 F.3d 818 (4th Cir. 1999) ...............................................................22

*Bartlett v. Roberts Recapping, Inc.*,
    153 S.E.2d 193 (Va. 1967).....................................................................27

*Bishop v. E.A. Strout Realty Agency, Inc.*,
    182 F.2d 503 (4th Cir. 1950) ...............................................................15

*Bott v. N Snellenburg & Co., Inc.*,
    14 S.E.2d 372 (Va. 1941).......................................................................16

*C.B. Van Nostrand & Co., Inc. v. Virginia Zinc & Chemical Corp.*,
    101 S.E. 65 ( Va. 1919)..........................................................................25

*Chisolm v. Transouth Financial Corp.*,
    194 F.R.D. 538 (2000) ..........................................................................22

*Clients' Security Fund of the Bar of New Jersey v. Security Title & Guaranty Co.*,
    634 A.2d 90 (N.J. 1993).........................................................................19

*Clifton v. Tomb*,
    21 F.3d 893 (4th Cir. 1927) ..................................................................25

*Collins v. Wayne Corp.*,
    621 F.2d 777 (5th Cir. 1980) ...............................................................26

*Commercial Business System, Inc. v. BellSouth Services, Inc.*,
    453 S.E.2d 261 (Va. 1995)...............................................................15, 20

*Daugherty v. Diment*,
    385 S.E.2d 572 (Va. 1989).....................................................................19

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Dean by Williams v. Watson*,
  1995 WL 692020 (N.D. Ill, 1996) .........................................................................27

*EEOC v. Central Wholesalers, Inc.*,
  573 F.3d 167 (4th Cir. 2009) ...............................................................................29

*Employers Commercial Union Insurance Co. v. Great American Insurance Co.*,
  200 S.E.2d 560 (Va. 1973)....................................................................................20

*Equitable Variable Life Ins. Co. v. Wood*,
  362 S.E.2d 741 (Va. 1987)....................................................................................13

*First American Title Insurance Co. v. Seaboard Savings & Loan Association*,
  315 S.E.2d 842 (Va. 1984).............................................................................12, 19

*First American Title Insurance Co. v. Vision Mortgage Corp. Inc.*,
  689 A.2d 154 (N.J. Super. 1997) .........................................................................18

*First Federal Savings & Loan Assoc. v. Charter Appraisal Co.*,
  724 A.2d 497 (Conn. 1999) ..................................................................................23

*Ford v. Guaranty Abstract and Title Co. Inc.*,
  553 P.2d 254 (Kan. 1976) .....................................................................................18

*Foremost Guaranty Corp. v. Meritor Savings Bank*,
  910 F.2d 118 (4th Cir. 1990) ...............................................................................20

*Glendale Federal Bank, FSB v. United States*,
  39 Fed. Cl. 422 (Fed. Cl. 1997) ...........................................................................27

*Green v. Ingram*,
  608 S.E.2d 917 (Va. 2005).....................................................................................27

*Jacobs v. Chicago Title Insurance Co.*,
  709 F.2d 3 (4th Cir. 1983) ....................................................................................18

*Jappell v. American Association of Blood Banks*,
  162 F. Supp. 2d 476 (E.D. Va. 2001) ..................................................................28

*Jefferson Standard Life Insurance Co. v. Hedrick*,
  27 S.E.2d 198 (Va. 1943)......................................................................................14

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Kreppel v. Guttman Breast Diagnostic Institute, Inc.*,
   1999 WL. 1243891 (S.D.N.Y. 1999) .................................................................................27

*Lawyers Title Insurance Corp. v. Edmar Construction Co.*,
   294 A.2d 865 (D.C. 1972) ...............................................................................................18

*Meyerson v. Lawyers Title Insurance Corp.*,
   39 A.D.2d 190 (N.Y. Sup. Ct., App. Div. 1972) ...............................................................18

*Midwest Bankcentre v. Old Republic Title Co. of St. Louis*,
   247 S.W.3d 116 (Mo. App. 2008) ...................................................................................28

*Montgomery Mutual Insurance Co. v. Riddle*,
   587 S.E.2d 513 (Va. 2003) .........................................................................................21, 22

*Moore Brothers Co. v. Brown & Root, Inc.*,
   207 F.3d 717 (4th Cir. 2000) ..........................................................................................21

*Norwest Corp. v. State Department of Insurance*,
   571 N.W.2d 628 (Neb. 1997) ..........................................................................................28

*Ost-West-Handel Bruno Bischoff v. Project Asia Line, Inc.*,
   970 F. Supp. 471 (E.D. Va. 1997) ..................................................................................22

*Packard Norfolk, Inc. v. Miller*,
   95 S.E.2d 207 (Va. 1956) ................................................................................................25

*Patel v. Anand, L.L.C.*,
   564 S.E.2d 140 (Va. 2002) .........................................................................................24, 25

*Private Mortgage Investment Services, Inc. v. Hotel & Club Associates, Inc.*,
   296 F.3d 308 (4th Cir. 2002) ..........................................................................................23

*Proctor v. Metropolitan Money Store Corp.*,
   579 F. Supp. 2d 724 (D. Md. 2008) ................................................................................13

*RTC Mortgage Trust 1994 N-1 v. Fidelity National Title Insurance Co.*,
   58 F. Supp. 2d 503 (D.N.J. 1999) ...................................................................................18

*Richards v. Attorneys' Title Guaranty Fund, Inc.*,
   866 F.2d 1570 (10th Cir. 1989) ......................................................................................18

# TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Sears Mortgage Corp. v. Rose*,
    634 A.2d 74 (N.J. 1993) .......................................................................18

*Smit v. Shippers' Choice of Virginia, Inc.*,
    674 S.E.2d 842 (Va. 2009) ...................................................................13

*Snavely v. Pickle*,
    70 Va. 27 (1877) ...................................................................................25

*Southern Packing Corp. v. Crumpler*,
    9 S.E.2d 446 (Va. 1940) .......................................................................15

*Superior Bank, F.S.B. v. Tandem National Mortgage*,
    197 F. Supp. 2d 298 (D. Md. 2000) .....................................................28

*United States v. Fulcher*,
    188 F. Supp. 2d 627 (W.D. Va. 2002) .................................................15

*Whitt v. Godwin*,
    139 S.E.2d 841 (Va. 1965) ...................................................................21

*Williamson v. Old Brogue, Inc.*,
    350 S.E.2d 621 (1986) ..........................................................................28

*Wood v. Pender-Doxey Grocery Co.*,
    144 S.E.635 (Va. 1928) ........................................................................26

*Worrie v. Boze*,
    95 S.E.2d 192 (Va. 1956) ................................................................26, 29

## STATUTES

Va. Code § 6.1-2.13 ....................................................................................27, 30

Va. Code § 6.1-2.15 ................................................................................3, 27, 30

Va. Code § 6.1-2.21(A) ....................................................................................12

Va. Code § 6.1-2.21(E) .....................................................................................12

Va. Code § 6.1-2.21 ..........................................................................................18

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

Va. Code § 38.2-1801 ...........................................................................................................1, 12, 13

## INTRODUCTION

Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") filed this lawsuit against Defendant Old Republic National Title Insurance Company ("Old Republic") to recover for the harm caused by a massive conspiracy to defraud perpetrated by Old Republic's agents — TitlePro, Inc. ("TitlePro") and TitlePro's president, Kamran Khan ("Khan").  It is undisputed that TitlePro and Khan conspired with a local mortgage lender, Financial Mortgage, Inc. ("FMI"), and FMI's president Vijay Taneja ("Taneja") to defraud Wells Fargo and other financial institutions in the secondary loan market.  In furtherance of this conspiracy, TitlePro and Khan misappropriated settlement proceeds from escrow, prepared fraudulent settlement documents, failed to record title documents and generated multiple fraudulent notes for the same transaction.  As a result, Wells Fargo purchased notes that were supposed to be secured by deeds of trust in first lien position but received notes that are unsecured, unenforceable and worthless.

Old Republic seeks summary judgment regarding all of Wells Fargo's claims — breach of contract, business conspiracy in violation of Va. Code § 18.2-499, civil conspiracy, fraud, violation of the Wet Settlement Act, Va. Code § 6.1-2.13, and negligence.  At base, Old Republic's motion is without merit because it is founded upon a false premise — that Khan was not acting within Old Republic's agency when he misappropriated settlement funds, generated fraudulent settlement documents, and failed to record title documents.  Under Virginia law, Old Republic is liable for Khan's wrongdoings for four independently sufficient reasons:

- *Virginia's Consumer Real Estate Protection Act ("CRESPA")* — CRESPA and Virginia's Insurance Title make title insurers liable for the actions of their appointed agents and, by express incorporation of the Insurance Code, mandates that "[a] licensed agent shall be held to be the agent of the insurer that issued the insurance sold, solicited or negotiated by such agent *in any controversy* between the insured or his beneficiary and the insurer" (Va. Code Ann. § 38.2-1801) (emphasis added);

- *Khan Used His Admitted Actual Authority* — Old Republic admits that Khan was authorized to issue its title insurance and that Khan intentionally used this authority to further the conspiracy by cloaking the sham transactions in a veil of legitimacy; and Wells Fargo would not have purchased the notes at issue if Khan had not represented that title insurance had been purchased;

- *Khan was Acting Within the Scope of His Duties to Old Republic* — Old Republic's Agency Agreement, supervision of Khan, exercise of veto power over Khan's settlement activities, and representations to the public confirm that Khan was acting within the scope of his duties to Old Republic when he engaged in the wrongdoings at issue; and

- *Old Republic Made Wells Fargo's Injuries Possible* —CRESPA requires that a person be appointed by a title insurer to provide settlement services, and Old Republic appointed Khan despite numerous red flags and ignored evidence that Khan was conducting suspicious transactions with Taneja that came to Old Republic's attention in fall 2007.

Old Republic's agency relationship with TitlePro and Khan is fatal to its motion for summary judgment. Old Republic's primary argument for dismissing Wells Fargo's statutory business conspiracy, civil conspiracy, fraud and negligence claims is lack of agency. Lack of agency also is critical to Old Republic's arguments regarding Wells Fargo's contract claims. Specifically, Old Republic's contract arguments are predicated on the failure of conditions (paying-off prior liens and recording title documents) that Khan controlled as well as FMI's fraud, in which Khan knowingly participated.

Old Republic, unable to deny agency effectively and faced with irrefutable evidence that its agents engaged in a massive fraud, asks this Court to adopt evidentiary standards for reliance and injury that the Supreme Court of Virginia has rejected. Old Republic argues that Wells Fargo must present direct testimony regarding reliance, yet the Supreme Court of Virginia has held that circumstantial evidence is sufficient. Likewise, Old Republic attempts to invent a requirement that Wells Fargo prove the value of each of the properties at issue, even though such proof is unnecessary and irrelevant under Virginia law.

Old Republic also argues that Wells Fargo lacks standing to bring a claim under the Wet Settlement Act and cannot establish a duty for purposes of its negligence claim. These

arguments have no merit.  The Wet Settlement Act expressly states that "[a]ny person suffering

losses" as a result of a violation can bring a claim.  *See* Va. Code. § 6.1-2.15.  Likewise, Wells

Fargo has pled an actionable duty for negligence purposes because it was reasonably foreseeable

that Wells Fargo would be injured by TitlePro's and Khan's actions.

In short, the Court should deny Old Republic's motion for summary judgment.

## STATEMENT OF UNDISPUTED FACTS

Old Republic's memorandum in support of its motion for summary judgment ("OR SJ

Mem.") confirms many of the facts set forth in Wells Fargo's memorandum in support of its

motion for partial summary judgment ("WF SJ Mem.").  Noteworthy facts include:

- Wells Fargo purchased the loans at issue in this case from FMI (OR SJ Mem. at 4);

- "The transactions giving rise to those loans were real estate refinancings and/or sales for which TitlePro served as the settlement agent" (*Id.*);

- Old Republic appointed TitlePro and Khan as agents (*Id.* at  4-5); and

- "TitlePro received the loan proceeds from FMI's warehouse lender, but gave those funds to FMI, rather than paying off the existing deeds of trust" (*Id.* at 6).

Old Republic also omits numerous material facts, which Wells Fargo provides below.

## I.      Old Republic's Agency Relationship with TitlePro and Khan

Old Republic mentions only one fact pertaining to the scope of its agency with TitlePro

and Khan, a recitation of § 12 of the Agency Agreement between Old Republic and TitlePro.

(OR SJ Mem. at 4-5.) [1]  Numerous additional facts also are relevant to the scope of agency.

### A.      Old Republic's Pre-Appointment Evaluation of Khan

Old Republic executed an Agency Agreement with TitlePro on January 23, 2007

("Agency Agreement"), and Khan signed the Agency Agreement on TitlePro's behalf.  Kevin

---

[1]  Old Republic's Agency Agreement with TitlePro, ORT001866-76, is attached as Exhibit ("Ex.") 1.

Pogoda, Old Republic's Virginia State Manager, testified that Old Republic ignored its own

standards by appointing Khan and TitlePro as agents despite knowing that Khan: had a "low"

credit score of 555; was the subject of a federal government-imposed tax lien; had a "very low"

volume of transactions in the prior year; and had been engaged in the unauthorized practice of

law. [2]  Pogoda further testified that Khan's low credit score and tax lien made Khan "more likely

* * * to steal from the escrow account."  (Pogoda Dep. 115:8-20, 128:14-129:5.)

### B.    Old Republic's Agency Agreement with TitlePro and Khan

In describing the Agency Agreement, Old Republic focuses on one provision, § 12.  Old

Republic ignores the rest of the Agreement, which on its face mandated how TitlePro and Khan

were required to perform settlement and escrow services.  Section 2 of the Agency Agreement,

entitled "Agent's Duties," states that an Old Republic agent "shall":

> C.    Timely transmit to the appropriate public office and cause the recording of all documents necessary to insure the interest, estate or title described in the policy;  * * * *
>
> F.    Keep safely in a federally insured trust account separate from Agent's operating accounts all funds received by Agent in connection with transactions where [Old Republic's] Title Insurance Forms are issued, and disburse said funds only for the purposes for which the same were entrusted, and reconcile all such accounts not less frequently than monthly; [and]
>
> G.    Comply with all statutes and rules and regulations relating to the licensing and operation of Agent's business * * * *.

(Agency Agreement § 2.)  Under the Agreement, Old Republic required Khan to submit monthly

reports of TitlePro's settlements.  (*Id.* §§ 2, 6.)  The Agency Agreement also gave Old Republic

the right to audit and review TitlePro's files, including all financial and business records relating

---

[2]  *See* 09/08/09 Deposition of Kevin Thomas Pogoda, Old Republic's Virginia State Manager and 30(b)(6) designee for the topic of agency ("Pogoda Dep.") at 115:8-20, 117:5-9, 126:15-127:5, 128:2-129:5, 150:3-5, 137:12-14, 147:8-11.)  Excerpts from the Pogoda Dep. are attached as Ex. 2.  For a full discussion of Pogoda's testimony regarding Old Republic's failure to follow its own standards when it appointed TitlePro and Khan, *see* WF SJ Mem. at 5-6.

to any escrow closing or settlement functions conducted by TitlePro.  (*Id.* § 11.)

Consistent with the duties set forth in the Agency Agreement, Pogoda testified that Old Republic agents are responsible for "collecting necessary documents" for settlement and play a part in ensuring "adherence to the lender's title instructions."  (Pogoda Dep. 64:4-65:2.)  When Khan became an Old Republic agent, Pogoda gave him a six-section framework for how he should maintain TitlePro's settlement files.  (*Id.* at 84:1-85:20; ORT 2919, Ex. 3.)  Pogoda instructed Khan on use of "an R 5 form," which bears no relation to the issuance of title insurance.  (*Id.* at 88:5-22.)  Pogoda provided a model fees schedule that set forth Old Republic's fees for settlement and escrow functions.  (*See id.* at 79:3-10, 89:7-18; ORT 2719, Ex. 4.)  In return, Khan sent Pogoda his proposed fees for Pogoda to review.  (ORT 2937-2940, Ex. 5.)

### C.    Old Republic's Control Over TitlePro's and Khan's Settlement and Escrow Activities

Old Republic supervised and controlled TitlePro's and Khan's settlement and escrow activities.  Old Republic exercised veto power over TitlePro's and Khan's authority to close settlements.  Abbey Gerken, a former Old Republic employee, testified that in fall 2007, Old Republic instructed Khan not to close two suspicious transactions involving Taneja.[3]  Old Republic audited TitlePro's files twice.  (Pogoda Dep. 38:7-39:2.)  Pogoda testified that "[a]nnually we conduct file audits and escrow audits" "to prevent fraud as well as to prevent negligence and to help the agents be all that they can be."  (*Id.* at 35:2-3, 36:3-5.)  As part of these audits, Old Republic verified that the agent properly paid off prior liens.  (*Id.* at 35:1-36:5, 46:13-16, 159:2-160:4.)  Pogoda further testified that "[o]ne thing that we do during audits is * * * to make sure that the recording of the document happened and it happened in a timely manner."  (*Id.* at 99:20-100:3.)

---

[3]  *See* 09/11/09 Deposition of Abbey Vera Gerken ("Gerken Dep.") at 45:2-46:6, 53:18-54:1. Excerpts from the Gerken Dep. are attached as Ex. 6.

**D.      Old Republic's Representations to the Public Regarding the Scope of TitlePro's and Khan's Agency**

Old Republic describes the scope of its agency with its title agents as encompassing all aspects of a real estate closing, including settlement and escrow, in a marketing brochure that it distributes to the public entitled "Earning Your Trust."[4]  Old Republic distributes the brochure to "persuade a consumer to buy title insurance and to inform the consumer about the process." (Pogoda Dep. 62:9-11.)  The "Earning Your Trust" brochure states:

> Old Republic Title and its agents act as a central clearinghouse for the parties involved — collecting necessary documents, insuring adherence to the lender's title instructions, making arrangements for proper payment and distribution of funds.  *We are fully prepared to work with you from the beginning of your transaction all the way through to conclusion.*  When you work with your friends at Old Republic Title or its agents, you can be confident that you will enjoy a successful closing.

(Ex. 7, emphasis added.)  Old Republic admits that it distributes this brochure through its agents and on its website, and that it sent the brochure to Khan.  (Pogoda Dep. 62:13-22, 70:4-72:10.)

**II.      TitlePro's and Khan's Conspiracy with FMI and Taneja**

The existence of the conspiracy among TitlePro, Khan, Taneja and FMI is undisputed. Old Republic refers to Khan's actions as a "fraudulent mortgage scheme" and admits that "TitlePro received the loan proceeds from FMI's warehouse lender, but gave those funds to FMI, rather than paying off the existing deeds of trust."  (OR SJ Mem. at 1, 6.)  Old Republic averred to the existence of the conspiracy in a claim it filed in Taneja's bankruptcy, and in a report to the Virginia Bureau of Insurance ("VBI").[5]  Pogoda also testified to the existence of the conspiracy:

> he [Khan] lied * * * I don't know when his opportunities came to conspire with Vijay [Taneja], I was not privy to that conversation or when it happened, but certainly he must have known at some point that doing so would have hurt my company and perhaps me professionally.

---

[4]  A copy of Old Republic's "Earning Your Trust" brochure is attached as Ex. 7.
[5]  Old Republic's filing in Taneja's bankruptcy and letter to the VBI are attached as Exs. 8-9.

(Pogoda Dep 152:6-11.)

Old Republic could have stopped this conspiracy in fall 2007, when it ignored a report from Abbey Gerken, a former Old Republic employee.  Gerken testified that she reported to her superiors that Khan was conducting suspicious settlements involving Taneja and that the title work was "really, really strange."  (Gerken Dep. 45:2-46:17.)  Despite this report, Old Republic did not terminate Khan's agency or preclude him from closing transactions with FMI and Taneja.

On April 18, 2008, Old Republic received a claim letter from another lender stating that TitlePro and Khan improperly sent escrow funds to FMI rather than using them to pay off prior liens in approximately 20 transactions.[6]  Upon receiving the letter, Old Republic sent Pogoda and James Partin, Old Republic's Senior Claims Counsel, to interview Khan.  (Partin Dep. 63:9-13.)  Pogoda testified that Khan admitted to "falsifying" files and creating "dummy transactions." (Pogoda Dep. 175:12-14, 176:7-13.)  Pogoda further testified that Khan admitted to knowingly and intentionally sending escrow funds to FMI rather than using the funds to pay off prior liens. (*See* WF SJ Mem. at 11, discussing Pogoda Dep. 177:4-17.)  Partin testified that, after interrogating Khan, he instructed Pogoda to confiscate from TitlePro all of "our [Old Republic's] files," including "files regarding how TitlePro or Khan had carried out their escrow responsibilities" and the "consolidated file[s]" that contained the settlement paperwork for the transactions that TitlePro closed.  (Partin Dep. 78:13-81:4.)

### III.    The Notes, Transactions, and Properties at Issue

Wells Fargo purchased the 17 notes at issue ("Virginia Notes"), which were purported to be secured by deeds of trust on 16 properties ("Virginia Properties"), pursuant to a November 2004 Loan Purchase Agreement with FMI.  Old Republic does not contest Wells Fargo's

---

[6]  *See* 09/09/09 Deposition of James Davis Partin, Old Republic's Senior Claims Counsel and 30(b)(6) designee regarding Old Republic's investigation of TitlePro's and Khan's wrongdoing ("Partin Dep.") at 53:8-54:19, 55:2-6.  Excerpts from the Partin Dep. are attached as Ex. 10.

ownership of the Notes.  (*See* OR SJ Mem. at 4.)[7]  TitlePro and Khan were the settlement agents for the transactions involving the Virginia Properties ("Virginia Transactions").  (*Id.* at 1.)

Old Republic's statement of facts suggests that TitlePro and Khan were bystanders in a fraud perpetrated by FMI and Taneja.  The facts prove otherwise.  Purported borrowers testified that Khan was their sole or primary contact and that Khan deceived and defrauded them.[8]  Two property owners, Laila Riaz and Manjeet Brar, testified that they knew Khan personally, discussed potential refinances with Khan, provided financial information to Khan, were informed by Khan that a refinance was not in their interest, and were surprised to later learn that a refinance had been conducted in their names.[9]  Riaz and Brar both testified that their signatures on the notes and deeds of trust for their properties — which Khan notarized — were forged. (Riaz Dep. 35:4-38:10, 61:15-65-5; Brar Dep. 49:19-50:4.)[10]  Similarly, Christine Cunningham, Khan's former friend and intern, testified that Khan pretended to sell her two properties, persuaded her to sign two notes, never transferred the properties to her, and "left [her] with 800,000 dollars in mortgage debt and no assets in return."  (Cunningham Dep. 64:3-67:22.)

Wells Fargo investigated the Virginia Transactions after receiving a tip from another

---

[7]  A copy of the November 2004 Loan Purchase Agreement is attached as Ex. 11.

[8]  Wells Fargo deposed five of the putative borrowers: Laila Riaz, Manjeet Brar, Hua Xu, Veena Maharaj  and Christine Cunningham.  Wells Fargo subpoenaed Sohail Sheikh and Arif Kamran, but they failed to appear.  Wells Fargo was unable to locate the other homeowners.

[9]  *See* 8/24/09 Deposition of Laila Riaz ("Riaz Dep.") at 25:14-15, 26:9-19, 28:18-29:11, 58:5-17.  *See also* 08/19/09 Deposition of Manjeet Brar ("Brar Dep.") at 16:3-11, 17:3-14, 18:18-19:6, 50:9-11.  Excerpts from the Riaz Dep. and Brar Dep. are attached as Exs. 12 and 13.

[10]  Old Republic does not dispute the authenticity of Khan's notary signatures on these or any other documents.  (OR Resp. to WF RFAs ¶ 1.)  Christine Cunningham testified that she provided secretarial and administrative services for Khan, that she saw Khan sign documents, and that she could identify Khan's signature.  *See* 8/31/09 Deposition of Christine Cunningham ("Cunningham Dep.") at 30:2-12.  Excerpts of the Cunningham Dep. are attached as Ex. 14. Cunningham verified Khan's signature as Notary on the Deeds of Trust and Notes for the Virginia Properties, including Riaz's Janet Rose Ct. Property.  (*Id.* at 80:14-139:113.)

bank.[11]  Wells Fargo's investigation found that for each of the Virginia Properties, Wells Fargo

did not have a first-lien security interest.  (McGrath Dep. 12:22-13:10; Sewich Dep. 21:7-18.)[12]

Moreover, with respect to at least 15 of the Virginia Properties, TitlePro did not pay off prior

recorded liens per the HUD-1, and TitlePro did not record most of the deeds of trust for the

Virginia Properties.  (*Id.*)

The HUD-1 for every Virginia Transaction identifies TitlePro as the settlement agent.

(HUD-1s, Ex. 17; *see also* OR SJ Mem. at 1.)  Old Republic has admitted that, for every

property other than Summit Drive and Poland Road, TitlePro and Khan:

- prepared HUD-1 settlement statements misrepresenting that escrow funds from a new loan would be used to pay off the prior recorded lien(s) on the Subject Property;

- received escrow funds designated for the purpose of paying off the prior recorded lien(s) on the Subject Property; and

- misappropriated the escrow funds by sending them to FMI instead of using them to pay off the prior recorded lien(s) on the Subject Property as discussed in the HUD-1.

(OR SJ Mem. at 6.)  With respect to the Summit Drive and Poland Road properties, Old

Republic has admitted FMI sold multiple copies of the same note to multiple lenders.  (OR SJ

Mem. at 8.)  Indeed, Wells Fargo's investigation indicated that the conspirators generated

multiple fraudulent notes for most of the Virginia Transactions (all except the Carroll Ave.,

Oakham Mount Dr., Caledonia Circle, and Wakewater Way transactions).[13]

It is undisputed that Khan actively participated in the generation and sale of multiple

fraudulent notes on the same property to secondary lenders.  Khan made payments to Wells

Fargo on some of the notes to prevent the fraud from being discovered.  (Sewich Dep. 13:7-

---

[11]  *See* 08/25/09 Deposition of Kimberly Ann Sewich ("Sewich Dep.") at 7:18-9:23.  Excerpts from the Sewich Dep. are attached as Ex. 15.  *See also* Deposition of Brian McGrath ("McGrath Dep.") at 12:2-11.  Excerpts from the McGrath Dep. are attached as Ex. 16.

[12]  *See also* 10/16/09 Declaration of Brian T. McGrath ("McGrath Decl.") ¶¶ 17-20, attached as Ex. A.

[13]  *See* 10/16/09 Declaration of Kimberly A. Sewich ("Sewich Decl.") ¶ 5, attached as Ex. B.

16:19.)  Laila Riaz and Christine Cunningham confronted Khan when they received notices from

Wells Fargo and other lenders.  In response, Khan said he would "make a few phone calls and

take care of that."  (Riaz Dep. 32:8-12; Cunningham Dep. 68:4-70:19.)  Additionally, Vena

Maharaj, the Poland Road property owner, testified that Khan conducted the closing in which the

fraudulent notes were prepared, notarized documents, and told her that he "will be doing all of

the paperwork" and "had all the papers ready to be signed."[14]  Ms. Maharaj also testified that

Taneja selected Khan as the settlement agent and that Khan rushed her through the settlement

and discouraged her from examining the documents for the transaction:

> [I]t's hard to remember because [the documents] were all stacked together, and
> we didn't really have much time to go over, and he [Khan] didn't explain to us
> anything.  He just said that, "You need to sign.  Everything is prepared.  I checked
> everything.  Everything is fine.  You just need to sign."

(Maharaj Dep. at 14:15-18, 29:12-18.)

TitlePro and Khan made additional misrepresentations to facilitate their misappropriation

of escrow funds.  Khan manufactured at least four fictitious real estate transactions.  As noted

above (at 8-9), Brar, Riaz and Cunningham testified that their transactions were scams.  Khan

notarized deeds of trust and notes for most of the Virginia Transactions.[15]  Yet, Khan did not

record a majority of those deeds of trust.  (*See supra* at 9; McGrath Decl. ¶ 21.)

TitlePro and Khan also used their authority as Old Republic agents to cloak the

fraudulent mortgage loans with a false veil of legitimacy.  TitlePro and Khan represented on the

HUD-1s that Old Republic was providing title insurance for the Virginia Transactions and issued

Old Republic title commitments and/or closing protection letters ("CPLs") for most of the

---

[14]  *See* 09/01/09 Deposition of Veena Maharaj ("Maharaj Dep.") at 12:11-21.  Excerpts from the
Maharaj Dep. are attached as Ex. 18.
[15]  *See* Notes, Ex. 19; Deeds of Trust, Ex. 20; Cunningham Dep. 80:14-139:14 (authenticating
Khan's signature).

Transactions.[16]  Pogoda testified that Khan admitted to intentionally issuing Old Republic title insurance to mislead lenders by "[c]reating documents, including a CPL to give the warehouse lender assurance that a transaction was occurring."  (Pogoda Dep. 177:6-8.)  The scheme would have failed without these representations.  At the time, Wells Fargo would not purchase a loan unless the HUD-1 stated that title insurance had been ordered.[17]

> **IV.    Wells Fargo's Reliance upon Khan's and TitlePro's Misrepresentations.**

Wells Fargo relied upon Khan's misrepresentations when it purchased the Virginia Notes. Wells Fargo relied upon the HUD-1s prepared by TitlePro and Khan to verify that the transactions were legitimate, that escrow funds were paid to extinguish prior liens, and that title insurance had been ordered.  (McGrath Decl. ¶ 11; Woodcock Dep. 24:21-25:3.)  Wells Fargo relies upon the title agent to file the deed of trust securing the notes it purchases.  (McGrath Decl. ¶ 12.)  Wells Fargo trusts title agents not to issue title insurance for transactions the title agents know to be fraudulent.  (*Id*. ¶ 13.)  Wells Fargo would not have purchased the Virginia Notes if it had known that Khan had misappropriated the escrow funds rather than using the funds to pay of the prior-liens on the properties at issue.  (*Id*. ¶¶ 25, 29.) All of the Virginia Notes are in default. (*Id*. ¶ 23.)  Because the Virginia Notes are unsecured, in default, and the product of fraud, the Virginia Notes that Wells Fargo purchased from FMI are worthless. (*Id.* ¶ 32.)

> **ARGUMENT**

> **I.    Old Republic is Liable for the Acts of Its Agents, TitlePro and Khan.**

Old Republic's arguments for summary judgment are largely predicated on the false premise that TitlePro and Khan were not acting as Old Republic's agents when they engaged in wrongdoing.  Old Republic is wrong for four reasons.

---

[16]  The title commitments, CPLs and HUD-1s are attached as Exs. 21, 22 and 17

[17]  *See* 08/27/09 Deposition of Mark Woodcock ("Woodcock Dep.") at 34:13-35:12.  Excerpts from Woodcock Dep. are attached as Ex. 23.

### A.   By Virginia Statute, TitlePro and Khan are Old Republic's Agents for Purposes of Wells Fargo's Claims.

CRESPA mandates that TitlePro and Khan "shall be deemed to be" the agents of Old Republic for purposes of its controversy with Wells Fargo.  CRESPA requires title insurers like Old Republic to supervise their title agents' settlement and escrow activities.  *See* Va. Code Ann. § 6.1-2.21(E).  The foundation for this supervision is Va. Code § 6.1-2.21(A), which requires that "[a]ny title insurance agent acting in the capacity of a settlement agent shall be appointed by a title insurance company licensed in the Commonwealth pursuant to Chapter 18 (§ 38.2-1800 et seq.) of Title 38.2."  Thus, TitlePro and Khan could not act as settlement agents unless they were appointed as an agent of a title insurance company.  In turn, Va. Code § 38.2-1801 describes a key consequence of this appointment — "[a] licensed agent *shall be held to be the agent of the insurer* that issued the insurance sold, solicited or negotiated by such agent *in any controversy* between the insured or his beneficiary and the insurer."  (Emphasis added.)

In this case, Old Republic admits to appointing TitlePro and Khan as agents.  (*See* OR SJ Mem. at 4.)  Old Republic cannot dispute that TitlePro and Khan "sold, solicited or negotiated" its title insurance for the Virginia Transactions.  The HUD-1s for those Transactions state that Old Republic was providing insurance, and TitlePro and Khan issued title commitments and/or closing protection letters for most of the transactions.  (*Id.* at 6-13; HUD-1s, Ex. 17.)

It also is undisputed that Wells Fargo is an "insured" in a "controversy" with Old Republic.  The title commitments that Old Republic issued incorporated the terms of the form American Land Title Association ("ALTA") Loan Policy.  (Pogoda Dep. 56:3-17; Partin Dep. 35:4-12.)  *See First Am. Title Ins. Co. v. Seaboard Savings and Loan Ass'n*, 315 S.E.2d 842, 845 (Va. 1984) (holding that title commitment incorporated terms of ALTA Policy).  The ALTA Loan Policy defines "insured" to include "the owner of the Indebtedness and each successor in

ownership of the Indebtedness." (*See* Ex. 24.)  Here, Wells Fargo is an insured because it is the undisputed owner of the Virginia Notes.  (*See* OR SJ Mem. at 4.)

Given these facts, Va. Code § 38.2-1801 mandates that TitlePro and Khan "shall be held to be the agent[s] of" Old Republic for purposes of the controversy between Wells Fargo and Old Republic.  "When the language of a statute is clear and unambiguous, we are bound by the plain meaning of that language."  *Smit v. Shippers' Choice of Va., Inc.*, 674 S.E.2d 842, 844 (Va. 2009).  No interpretation excusing Old Republic for the wrongdoing of its appointed agents is permitted by the statute's plain language.  Indeed, the Supreme Court of Virginia in *Equitable Variable Life Ins. Co. v. Wood*, held that Va. Code § 38.2-1801, once triggered by an agent's sale of insurance, precludes the argument that the agent who sold, solicited or negotiated the insurance lacked authority to act on behalf of the insurer.  362 S.E.2d 741, 743 (Va. 1987).  In that case, the Court applied Va. Code § 38.2-1801 to reject an argument that the agent lacked authority to receive notice on behalf of the insurer.  *Id.*

Va. Code § 38.2-1801 renders Old Republic's arguments concerning cases from other jurisdictions irrelevant.  In *Proctor v. Metropolitan Money Store Corp.*, 579 F. Supp. 2d 724 (D. Md. 2008), which Old Republic relies upon (OR SJ Mem. at 18, 20-21) most extensively, the court relied on a provision of the Maryland Insurance Code declaring that a title agent's license "'does not create any actual, apparent, or inherent authority in the holder to represent or commit an insurer.'"  *Id.* at 739-40 (*quoting* Md. Code Ann., Ins. § 10-113(c)).  Thus, *Proctor* and Old Republic's other cases are inapposite because they conflict with Virginia law. [18]

---

[18]  *Proctor* and Old Republic's other cases are inapposite for additional reasons.  *First*, in Old Republic's cases the title agents did not knowingly use the title insurer's admitted authority to further a conspiracy.  (*Infra* at 14-15.)  *Second*, Old Republic's cases ignore the principle, long recognized both by the Fourth Circuit and by the Supreme Court of Virginia, that whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person

**B.     TitlePro and Khan Used Old Republic's Admitted Actual Authority to Further the Conspiracy.**

Old Republic is responsible for TitlePro's and Khan's wrongdoings because TitlePro and Khan knowingly used Old Republic's actual authority — admitted by Old Republic — to cloak their fraudulent transactions in a false veil of legitimacy.  As the Supreme Court of Virginia held in *Jefferson Standard Life Ins. Co. v. Hedrick*, "[t]he principal is also liable for the fraudulent or deceitful act of his agent committed as an incident to and during the performance of an act which is within the scope of the agent's authority." 27 S.E.2d 198, 202 (Va. 1943) (citation omitted). Old Republic concedes that it authorized TitlePro and Khan to issue Old Republic title insurance, title commitments and closing protection letters ("CPLs").  (OR SJ Mem. at 1, 5.)  Pogoda testified that Khan intentionally used this authority to make his fraudulent real estate transactions appear legitimate, stating that Khan admitted to "[c]reating documents, including a CPL to give the warehouse lender assurance that a transaction was occurring."  (Pogoda Dep. 177:6-8.) TitlePro and Khan represented that Old Republic was providing title insurance on every HUD-1 and issued title commitments and/or closing protection letters for almost all of the transactions.

Absent Khan's representations regarding Old Republic's issuance of insurance, there would have been no fraud, and no injury to Wells Fargo.  Wells Fargo, at the time of the transactions at issue, would not purchase a note unless the HUD-1 for the transaction reflected that title insurance had been ordered.  (Woodcock Dep. 34:13-35:12.)  Old Republic, having vested TitlePro and Khan with the authority — needed and used — to accomplish a fraud and conspiracy, cannot escape responsibility for the harms caused by the fraud and conspiracy.

---

to occasion the loss must sustain it. (*Infra* at 18-19.)  *Third*, none of Old Republic's cases involved the overwhelming evidence in this case that TitlePro and Khan were acting within Old Republic's agency when they engaged in wrongdoing.  (*Infra* at 15-17.)

### C.    TitlePro and Khan are Old Republic's Common Law Agents.

Old Republic also is responsible for TitlePro's and Khan's wrongdoings because those wrongdoings were committed within Old Republic's agency under Virginia common law.  The relevant test is whether the wrongs were "within the scope of the duties" for which TitlePro and Khan were engaged.  *Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 453 S.E.2d 261, 266 (Va. 1995).  Moreover, "[i]t is well settled that, when an agency relationship has been proven, the burden is upon the principal to show that the agent was not acting within the scope of his authority when he committed the acts complained of * * * *"  *Id.* at 265.

In this case, Old Republic only can point to one fact — irrelevant under Virginia law — to support its flawed theory that TitlePro's and Khan's settlement and escrow activities fall outside of their agency responsibilities to Old Republic.  Old Republic relies upon a self-serving provision in § 12 of its Agency Agreement that purports to eliminate Old Republic's liability to third parties for TitlePro's and Khan's settlement and escrow activities.  The Supreme Court of Virginia, in *Southern Packing Corp. v. Crumpler*, held that such provisions have no effect on third parties and refused to allow a meat packer to rely upon a similar provision to avoid honoring commitments made by the meat packer's agent, stating:

> While, as between principal and agent, the scope of the latter's authority is that authority which is actually conferred upon him by his principal, which may be limited by secret instructions and restrictions, such instructions and restrictions do not affect third parties ignorant thereof.

9 S.E.2d 446, 447 (Va. 1940).  The Fourth Circuit came to the same conclusion in *Bishop v. E.A. Strout Realty Agency, Inc.*, 182 F.2d 503 (4th Cir. 1950), holding that "[t]he rules of law applicable to such a situation are too elementary to justify discussion." *Id.* at 506.  Moreover, an agency agreement is but one piece of evidence, to be considered amongst all the evidence, when determining the scope of agency.  As the court held in *United States v. Fulcher*,

> "At least if the rights of a third person are involved, powers will be implied on the basis of conduct despite the failure of the express agreement to give such powers, *and indeed, even though they are specifically prohibited by the original agreement creating the agency.*"

188 F. Supp. 2d 627, 635 (W.D. Va. 2002) (*quoting* 2A C.J.S. *Agency* § 155, pp. 783-84; emphasis omitted).  In this case, the facts material to agency all confirm that TitlePro's and Khan's settlement and escrow activities fell within their agency with Old Republic.

Old Republic's reliance upon § 12 of the Agency Agreement is misplaced because § 12 cannot be reconciled with the specific duties that TitlePro and Khan were required to fulfill under § 2 of that Agreement, which is entitled "Agent's Duties."  As the Supreme Court of Virginia held in *Bott v. N Snellenburg & Co., Inc.*, "a general provision in a contract must give way to a special one covering the same ground."  14 S.E.2d 372, 374-375 (Va. 1941).  The "Agent's Duties" specified in the Agreement match TitlePro's and Khan's tortious conduct:

| Agent's Duties in Old Republic Agency Agreement | Illegal and Tortious Acts Committed by TitlePro and Khan |
|---|---|
| "Timely transmit to the appropriate public office and cause the recording of all documents necessary to insure the interest, estate or title described in the policy * * * *" | TitlePro and Khan failed to record deeds of trust securing Wells Fargo's notes, thereby depriving Wells Fargo of a security interest in the Virginia Properties. |
| "Keep safely * * * all funds received by Agent in connection with transactions * * *, and disburse said funds only for the purposes for which the same were entrusted * * * *" | TitlePro and Khan misappropriated escrow funds by sending the funds to FMI rather than using the funds to pay off prior-recorded liens as reflected in the HUD-1s. |
| "Comply with all statutes and rules and regulations relating to the licensing and operations of Agent's business." | TitlePro and Khan failed to file deeds of trust and released escrow funds prior to filing such deeds, in violation of the Wet Settlement Act. |

The Agency Agreement also belies Old Republic's suggestion (OR SJ Mem. at 5) that Old Republic did not receive value from TitlePro's settlement and escrow activities.  To the contrary, Old Republic received marketing and referrals for its products, services so valuable that Old Republic compensated Khan by allowing him to keep *eighty percent* of all premiums he

generated from the sale of Old Republic's insurance products.  (Agency Agreement § 6(A).)

Additionally, Old Republic's course of conduct with TitlePro and Khan confirms Old Republic controlled how TitlePro and Khan provided settlement and escrow services.  Old Republic possessed and exercised veto power over TitlePro's and Khan's authority to close settlements.  (*See supra* at 5.)  Old Republic conducted detailed audits of TitlePro's files twice in 2007.  (*See supra* at 4-5.)  Old Republic instructed Khan regarding how to conduct settlements and administer escrow funds.  (*See supra* at. 5.)  Old Republic provided Khan with a model fees schedule for settlement and escrow functions, and Khan sent his proposed fees to Pogoda for review.  (*Id*.)  Moreover, Old Republic's confiscation of TitlePro's files, its investigator's reference to those files as "our files" and Old Republic's presumed entitlement to take those files confirm that Old Republic controlled TitlePro's settlement and escrow activities.  (*Id.* at. 7.)

Old Republic's communications to the public further confirm that Old Republic's agency relationship with TitlePro and Khan encompassed their settlement and escrow responsibilities.  In the "Earning Your Trust" brochure (discussed *supra* at 6), Old Republic tells the public that Old Republic will oversee every aspect of a real estate closing:

> Old Republic Title and its agents act as a central clearinghouse for the parties involved — collecting necessary documents, insuring adherence to the lender's title instructions, making arrangements for proper payment and distribution of funds.  *We are fully prepared to work with you from the beginning of your transaction all the way through to conclusion.*  When you work with your friends at Old Republic Title or its agents, you can be confident that you will enjoy a successful closing.

(Ex. 7.)  (Emphasis added.)  Old Republic admits that it distributes this brochure through its agents and on its website.  (*See supra* at 6 discussing Pogoda Dep. 62:13-22, 70:4-72:11.)

### D.   Old Republic is Liable for TitlePro's and Khan's Wrongdoings Because It Made Those Wrongdoings Possible.

Old Republic cites a handful of cases — which Old Republic wrongly describes a

"substantial majority" — failing to hold title insurers liable for the settlement and escrow defalcations of their agents.  (*See* OR SJ Mem. at 18-21.)  Contrary to Old Republic's suggestion, even more courts have held title insurers liable for their agents' wrongs.[19]   In general, these courts have relied upon the same legal principle, "long recognized both by [the Fourth Circuit] and by the Supreme Court of Virginia, that 'whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it.'"  *Jacobs v. Chicago Title Ins. Co.*, 709 F.2d 3, 5 (4th Cir. 1983) (citation omitted).  Not one of Old Republic's cases refers to this principle.

In this case, Old Republic cannot deny that it made possible TitlePro's and Khan's wrongdoings.  Under Va. Code § 6.1-2.21, TitlePro and Khan could not provide settlement and escrow services without Old Republic's agency appointment.  Old Republic, by its own admission, ignored its own standards when it hired Khan despite knowing of his low credit score, IRS tax lien, low historic volume of business, and unauthorized practice of law.  (*See supra* at 3-4.)  Old Republic admitted that these factors made Khan more likely "to steal from the escrow account."  (*Id.*)  Old Republic also ignored a report in fall 2007 that Khan was attempting to close two "suspicious transactions" involving Taneja.  (*Id.* at 5.)  Under such circumstances, Virginia law compels the Court to hold Old Republic liable for Khan's wrongdoings.

## II.     Wells Fargo's Claim for Breach of Contract is Legally and Factually Sound.

Old Republic seeks summary judgment on Wells Fargo's breach of contract claim on two

---

[19] *See, e.g., Richards v. Attorneys' Title Guar. Fund, Inc.*, 866 F.2d 1570, 1572-73 (10th Cir. 1989); *Sears Mortgage Corp. v. Rose*, 634 A.2d 74, 83 (N.J. 1993); *Lawyers Title Ins. Corp. v. Edmar Constr. Co.*, 294 A.2d 865, 869-70 (D.C. 1972); *Meyerson v. Lawyers Title Ins. Corp.*, 39 A.D.2d 190, 194 (N.Y. Sup. Ct., App. Div. 1972); *First Am. Title Ins. Co. v. Vision Mortgage Corp. Inc.*, 689 A.2d 154, 157 (N.J. Super. 1997); *see also Ford v. Guar. Abstract and Title Co. Inc.*, 553 P.2d 254, 268 (Kan. 1976); *RTC Mortgage Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.*, 58 F. Supp. 2d 503, 539 (D.N.J. 1999) (same).

grounds.  First, Old Republic argues (OR SJ Mem. at 14-16) that Wells Fargo's claims are

precluded by FMI's fraud.  Second, Old Republic argues (*id*. at 16-17) that Wells Fargo cannot

enforce the title commitments that Old Republic issued through Khan because conditions were

not satisfied that required any prior lien(s) to be paid off and the deed of trust to be recorded.

Old Republic's arguments are without merit because Khan knowingly participated in FMI's

fraud and was responsible for the failure of the conditions set forth in the title commitments.

### A.      FMI's Fraud is No Bar to Wells Fargo's Contract Claim.

Old Republic argues — wrongly — that Wells Fargo, as FMI's successor, cannot bring

any claim that FMI could not bring, and therefore, because of FMI's fraud, Wells Fargo has no

claim under the title commitments and closing protection letters that Old Republic issued to FMI.

(OR SJ Mem. at 14-16.)  Old Republic's reliance on FMI's fraud is misplaced for two reasons.

*First*, Old Republic ignores the terms of its own policy. When Old Republic issues a title

insurance policy, it uses a form policy prepared by the American Land Title Association

("ALTA").  (*See* Pogoda Dep. at 56:9-17.)  The title commitment, title insurance policy and

closing protection letter that Old Republic issues together constitute one valid and enforceable

contract.[20]  Applying this black letter principal, the Supreme Court of Virginia in *First Am. Title

Ins. Co. v. Seaboard Savings and Loan Ass'n*, held that a title commitment incorporated the

terms of the ALTA Policy referenced therein.  315 S.E.2d at 845.[21]  The ALTA Loan Policy

absolves a "successor" such as Wells Fargo of defenses that could be brought against a

---

[20]  As the Supreme Court of Virginia held in *Daugherty v. Diment*, "[w]here a business
transaction is based upon more than one document executed by the parties, the documents will be
construed together to determine the intent of the parties; each document will be employed to
ascertain the meaning intended to be expressed by the others."  385 S.E.2d 572, 574 (Va. 1989).
[21]  The Supreme Court of New Jersey similarly has held that a CPL must be construed as part of
the title insurance policy.  *Clients' Sec. Fund of the Bar of New Jersey v. Sec. Title and Guar.
Co.*, 634 A.2d 90, 99 (N.J. 1993).

"predecessor insured," such as FMI, stating that Old Republic:

> reserv[ed] * * * all rights and defenses as to any successor that the Company would have had against any predecessor Insured, *unless* the successor acquired the Indebtedness *as a purchaser for value without knowledge* of the asserted defect, lien, encumbrance or other matter insured by this policy.

ALTA Policy, Ex. 24 (emphasis added).  In this case, it is undisputed that Wells Fargo purchased each of the notes at issue in this case from FMI for value and without knowledge of FMI's fraud. (*See* OR SJ Mem. at 4.)  Thus, by the terms of Old Republic's policy, Old Republic is barred from asserting FMI's fraud as a defense against Wells Fargo.

*Second*, Old Republic cannot rely upon FMI's fraud because Old Republic, through its agents TitlePro and Khan, possessed full knowledge of the fraud.  In *Foremost Guaranty Corp. v. Meritor Savings Bank*, the United States Court of Appeals for the Fourth Circuit held that insurers could not rescind a mortgage insurance policy based on alleged oral misrepresentations because the insurers "had in their possession the written memoranda contradicting the oral representations." 910 F.2d 118, 127 (4th Cir. 1990).  The Supreme Court of Virginia likewise has rejected attempts by insurers to disavow knowledge of facts known by their agents.[22]  In *Employers Commercial Union Insurance Co. of America v. Great American Insurance Co.*, the Supreme Court of Virginia held that "[t]he insurance agent, within the general scope of the business he transacts, is Pro hac vice the insurance company.  What he knows, they know. What he does, they do." 200 S.E.2d 560, 563 (Va. 1973) (citation omitted).  In this case, TitlePro and

---

[22]  Khan's participation in the fraud does not fall outside his agency relationship merely because it is intentional and tortious.  "The courts * * * have long since departed from the rule of non-liability of an employer for willful or malicious acts of his employee. * * * The test of liability is not the motive of the employee in committing the act complained of, but whether that act was within the scope of the duties of employment and in the execution of the service for which he was engaged."  *Commercial Bus. Sys., Inc..*, 453 S.E.2d at 266.

Khan knowingly participated in FMI's fraud and their knowledge is attributed to Old Republic.[23]

**B.      The Defalcations of Old Republic's Agents, TitlePro and Khan, are No Bar to Wells Fargo's Contract Claim.**

Old Republic argues that it is entitled to escape its obligations under the title commitments it issued through TitlePro and Khan because the commitments contained conditions that "were not satisfied."[24]   (*See* OR SJ Mem. at 16.)  Specifically, Old Republic argues that "[t]he commitments * * * list the requirements for recording the new Deed of Trust, and the payment and release of the existing deed(s) of trust."  (*Id.*)  In its statement of facts, Old Republic asserts that these conditions were not met for each of the Virginia Properties (with the exception of Summit Drive), yet Old Republic omits any reference to *who* failed to satisfy those conditions — Old Republic's agents, TitlePro and Khan.  (*Id.* at 7-12.)

The "prevention doctrine" precludes Old Republic from relying upon the failure of its agents, TitlePro and Khan, to excuse its failure to meet its contractual obligations.  Under the prevention doctrine, "if a promisor prevents or hinders fulfillment of a condition to his performance, the condition may be waived or excused."  *Moore Bros. Co. v. Brown & Root, Inc.,* 207 F.3d 717, 725 (4th Cir. 2000); s*ee also Whitt v. Godwin,* 139 S.E.2d 841, 844 (Va. 1965).  In this case, Old Republic, through its agents TitlePro and Khan, was responsible for the failed

---

[23] Old Republic's reliance on FMI's fraud is belied by a proof of claim it filed in Taneja's bankruptcy in which Old Republic argues that FMI's fraud does not relieve it of its obligations under a CPL.  (*See* Ex. 8, Proof of Claim at 2.)  Old Republic's attempt to obtain contradictory rulings undermines the force of its arguments here.

[24] Old Republic also argues that "Wells Fargo does not have a title commitment claim for the three transactions for which it did not receive a commitment (Kamran, Riaz and Sheikh-Wakewater Way)."  (OR SJ Mem. at 15.)  Old Republic is wrong.  The HUD-1s that Khan prepared for the Virginia Transactions state that Old Republic is providing title insurance.  (*See* HUD-1s, Ex. 17.)  Khan's representation regarding the existence of insurance is binding upon Old Republic.  *See Montgomery Mut. Ins. Co. v. Riddle,* 587 S.E.2d 513, 514 (Va. 2003) (holding that agent "orally bound" insurer to issue insurance by representing to policyholder that coverage was effective).

conditions.  The prior liens were not released and the deeds of trust were not recorded because

Khan misappropriated the money that was to be used to pay off the prior liens and failed to

record the deeds of trust.  (*See* OR SJ Mem. at 6.)

### III.   Wells Fargo has Ample Evidence that it Relied Upon and was Injured by TitlePro's and Khan's Misrepresentations to Support its Fraud Claim.

Old Republic wrongly argues that Wells Fargo cannot prevail on its fraud claims unless it

can produce direct evidence of reliance in the form of 17 witnesses (one for each of the 17

transactions) that will testify from first-hand knowledge that they specifically remember relying

upon TitlePro's and Khan's misrepresentations.  (OR SJ Mem. at 23.)  Old Republic's argument

is contrary to Virginia law.[25]   This Court has held that, for purposes of:

> common law fraud in Virginia * * *, reliance may be demonstrated by
> circumstantial or direct evidence.  Indeed, "[c]ircumstantial evidence is not only
> sufficient, but in most cases is the only proof that can be adduced.  * * *
> Moreover, [a] transaction may of itself and by itself furnish the most satisfactory
> proof of fraud, so conclusive as to outweigh the answer of the defendant and even
> the evidence of witnesses."

*Chisolm v. Transouth Fin. Corp.*, 194 F.R.D. 538, 560 n.24 (2000) (citation omitted).

This is just such a case where "[a] transaction may of itself and by itself furnish the most

satisfactory proof."  (*Id.*)  It is undisputed that Wells Fargo purchased the 17 notes at issue and

that each note was sold as a mortgage backed by a security interest in one of the Virginia

Properties.  (*See supra* at 7-8, 11.)  Wells Fargo's payment of millions of dollars for the notes at

issue demonstrates that Wells Fargo relied upon Khan's numerous misrepresentations that made

---

[25] The cases that Old Republic cites do not support its assertion that Virginia law requires direct testimony regarding reliance.  *Bank of Montreal v. Signet Bank* merely holds that reasonable reliance is an element of fraud and considers whether a plaintiff's reliance was reasonable. 193 F.3d 818, 830 (4th Cir. 1999).  In *Montgomery Mut. Ins. Co. v. Riddle*, the plaintiff's agent admitted that he did not review an insurance application for substance, and based on that admission, the court found an absence of reliance. 587 S.E.2d at 515.  In *Ost-West-Handel Bruno Bischoff v. Project Asia Line, Inc.*, this Court found no evidence that a misrepresentation had been made, thus never reaching any question regarding the types of evidence that are sufficient to demonstrate reliance.  970 F. Supp. 471, 483 (E.D. Va. 1997).

the notes appear to be valid and secured by deeds of trust in a first lien position.

Nevertheless, Wells Fargo has provided substantial additional evidence of its reliance in the form of testimony regarding Wells Fargo's procedures and practices. When Wells Fargo purchased these notes, it relied upon the HUD-1s prepared by TitlePro and Khan to verify that the transactions were legitimate, that escrow funds were paid properly to extinguish prior liens, and to verify that title insurance had been ordered. (*See supra* at 11.) Wells Fargo would never knowingly purchase an unsecured note generated as part of a real estate transaction. (McGrath Decl. ¶ 29.) Wells Fargo would not have purchased the Virginia Notes if it had known that TitlePro and Khan had misappropriated the escrow funds rather than using them to pay of the prior liens on the properties at issue. (*Id*. ¶¶ 25, 29.) Wells Fargo would not have purchased the Virginia Notes if it knew that borrowers' signatures had been forged on documents that Khan notarized. (*Id.* ¶ 26.) Wells Fargo would not have purchased the Notes if it had known that TitlePro and Khan had no intention of filing the deeds of trust for the transactions at issue. (*Id.* ¶ 27.) Wells Fargo also trusted that TitlePro and Khan would not issue title insurance for transactions the title agent knows to be fraudulent. (*Id.* ¶ 28.)

This testimony is more than sufficient to establish Wells Fargo's reliance when it purchased the notes at issue. The Fourth Circuit has held that similar testimony regarding a financial institution's practices and procedures is sufficient to demonstrate reliance. In *Private Mortgage Investment Services,, Inc. v. Hotel and Club Assocs., Inc.*, 296 F.3d 308, 315-316 (4th Cir. 2002), the testimony of a bank's president was sufficient to establish the bank's reliance upon a faulty real estate appraisal, even though there is no mention of evidence that the bank's president was personally involved in the transaction. Likewise in *First Federal Savings and Loan Association v. Charter Appraisal Co., Inc.*, a bank adequately demonstrated reliance upon a

faulty appraisal through testimony regarding the bank's guidelines and procedures:

> The appraiser also argues that, because the bank failed to produce witnesses who personally had been involved in approving the purchase of the promissory note and mortgage, the trial court had insufficient evidence to find that the bank had relied on the appraisal in entering into this transaction. The absence of direct evidence of such reliance is not crucial, however, because it readily may be established by circumstantial evidence. * * * The court had substantial evidence of the bank's reliance on the appraisal, including not only the guidelines used to evaluate the borrowers' mortgage loan application, but also the testimony of the bank's chief underwriter at the time the mortgage loan was approved.

724 A.2d 497, 506 (Conn. 1999) (citation omitted); *see also Amerifirst Sav. Bank of Xenia v. Krug*, 737 N.E.2d 68, 88 (Ohio Ct. App. 1999).

Old Republic also errs when it argues that Wells Fargo's fraud claim fails on the ground that "Wells Fargo does not have any evidence that it can present in its case in chief as to the value of the properties that were to serve as collateral for these loans." (OR SJ Mem. at 24-25.) In support, Old Republic cites *Patel v. Anand, L.L.C.*, which states in pertinent part:

> Generally, a person who acquired property by virtue of a commercial transaction and who has been defrauded by false representations is entitled to recover as damages the difference between the actual value of the property *at the time the contract was made* and the value that the property would have possessed had the representation been true.

564 S.E.2d 140, 143 (Va. 2002) (*quoting Prospect Dev. Co., Inc. v. Bershader*, 515 S.E.2d 291, 300 (Va. 1999)) (emphasis added). Old Republic misplaces reliance upon *Patel* for four reasons.

*First*, in this case, unlike in *Patel*, the value of the property that Wells Fargo bargained for and the value of the property that Wells Fargo received cannot reasonably be disputed. Wells Fargo purchased the right to be paid the amount of principal plus interest set forth on each of the Virginia Notes. (*See* Notes Ex. 19.) Wells Fargo received worthless paper. It is undisputed that Wells Fargo's notes were generated pursuant to TitlePro's, Khan's, FMI's and Taneja's fraud. Brar, Riaz and Cunningham testified that they were scammed by Khan (*see supra* at 10), and Old Republic concedes that "[i]t is undisputed that FMI was integrally involved in the fraudulent

- 24 -

activities surrounding the notes at issue." (OR SJ Mem. at 15.) As the Supreme Court of

Virginia held in *Packard Norfolk, Inc. v. Miller*, the Virginia Notes' fraudulent origin renders

them unenforceable:

> Because of the fraud practiced in the procurement of the contract, the entire
> instrument — the whole contract — is rendered voidable at the instance of the
> defrauded party. At his election the quoted provision as well as all other
> provisions of the contract are voided for no *binding* contract ever came into
> existence.

95 S.E.2d 207, 212 (Va. 1956).[26] Indeed, Old Republic attempts to misapply this very same

legal principle to avoid its contractual obligations to Wells Fargo. (OR SJ Mem. at 15-16.)[27]

Because Wells Fargo bargained for enforceable notes and received worthless paper, Wells

Fargo's damages are clear — the principal and interest due on the notes.

    *Second*, Old Republic is right that the Virginia Notes were to be secured by liens on the

Virginia Properties, but Old Republic is wrong when it argues that Wells Fargo must prove the

current value of those Properties to establish its damages. The value of Wells Fargo's security

interest would be relevant only if Wells Fargo had enforceable notes. "It is essential to a

mortgage that there should be a debt to be secured." *Snavely v. Pickle*, 70 Va. 27 (1877); *see

also C.B. Van Nostrand & Co., Inc. v. Va. Zinc & Chem. Corp. Ltd., et. al*, 101 S.E. 65, 68 ( Va.

1919). Additionally, *Patel* makes clear that it would be the value of the Virginia Properties *at

the time of sale*, and not the value of the Properties now, that would be relevant. *Patel*, 564

S.E.2d at 143. When Wells Fargo purchased the Virginia Notes, the Properties were appraised

for more than the face value of the Notes. (*See* 10/16/09 Declaration of Mark D. Woodcock

---

[26] Similarly, "[a]ny contract having for its object or which in effect perpetrates a fraud on a third person is illegal and void, and therefore unenforceable, either in equity or at law." *Clifton v. Tomb*, 21 F.3d 893, 900 (4th Cir. 1927).

[27] As discussed *supra* at 20, Old Republic is precluded from relying upon FMI's fraud as a contractual defense by the terms of Old Republic's insurance and because TitlePro's and Khan's knowledge of the fraud is imputed to Old Republic.

("Woodcock Decl.") ¶ 4, attached as Ex. C; McGrath Decl. ¶ 22; appraisals, Ex. 25.)[28]

*Third*, the damages calculation set forth in *Patel* is not the only permissible calculation of damages in a fraud case.  As this Court held in *American General Ins. Co. v. Equitable Gen. Corp.*, "where the ill-gotten gain received by the defrauding defendant as a result of fraud exceeds a plaintiff's actual damages[,] the gain will establish the defrauded plaintiff's recovery." 493 F. Supp. 721, 766 (E.D. Va. 1980).  Old Republic has admitted that the conspirators received an amount equal to the face value of the Virginia Notes when TitlePro and Khan transferred the proceeds of the associated loans to FMI rather than using them to pay-off the prior recorded liens. (*See supra* at 9.)  Accordingly, this amount sets the floor for Wells Fargo's damages.

*Fourth*, even if there was uncertainty regarding the amount of Wells Fargo's damages (and there is not), Wells Fargo would be entitled to have its damages determined by a jury.  The Supreme Court of Virginia addressed just such a situation in the context of a breach of contract claim in *Wood v. Pender-Doxey Grocery Co.*, holding:

> The violator of his contract should not be allowed to escape liability simply because the precise amount of the damages for which he is responsible is uncertain. * * * [I]t is for the jury, under proper instruction, to determine the compensation to be awarded for the breach.  That compensation should be the value of the contract.

144 S.E.635, 638 (Va. 1928).[29]

---

[28]  The accuracy of the appraisals is irrelevant.  As part of FMI's sale of the fraudulent notes to Wells Fargo, FMI warranted that the appraisals were accurate. (Woodcock Decl. ¶ 5; McGrath Decl. ¶ 22; Sellers Guide Excerpts, Ex. 26.)  As a result, FMI's co-conspirators would be liable if FMI misrepresented values of the properties in the appraisals.  *See Worrie v. Boze*, 95 S.E.2d 192, 199 (Va. 1956) (holding that conspirators are jointly and severally liable).

[29]  Old Republic also is wrong that "Wells Fargo does not have any evidence that it can present in its case in chief as to the value of the properties that were to serve as collateral for these loans."  (OR SJ Mem. at 4.)  If Wells Fargo needed such proof, it could present testimony that the properties were appraised for more than the value of the notes at the time of purchase.  (*See supra* at 24.)  Wells Fargo also could present the appraisals performed by Old Republic's experts as admissions setting a floor for the value of the properties.  *See Collins v. Wayne Corp.*, 621

IV.     **Wells Fargo's Claim for Violation of the Wet Settlement Act is Legally and Factually Sound.**

Virginia's Wet Settlement Act (the "WSA") obligates settlement agents in certain residential transactions to record deeds of trust promptly. *See* Va. Code § 6.1-2.13. The WSA also prohibits settlement agents from disbursing settlement funds before they record the relevant deeds of trust. *Id*. TitlePro and Khan, acting as Old Republic's agents, breached both conditions. (*See* OR SJ Mem. at 6.) Nevertheless, Old Republic wrongly argues that it is entitled to summary judgment because (in addition to its baseless challenge regarding agency) Wells Fargo's claim is derivative of FMI's rights. (OR SJ Mem. at 26.) To the contrary, the WSA grants Wells Fargo a direct cause of action. The WSA creates a cause of action on behalf of "[a]ny person suffering losses." Va. Code § 6.1-2.15. Accordingly, Wells Fargo, as a "person suffering losses," is entitled to bring a claim under the plain language of the WSA.

V.      **Wells Fargo's Negligence Claim is Legally and Factually Sound.**

Old Republic argues that Wells Fargo's negligence claim is flawed because Wells Fargo cannot identify an actionable duty.[30] (OR SJ Mem. at 26.) Old Republic's sole support is a statement from *Bartlett v. Roberts Recapping, Inc.* that "where there is no breach or violation of a legal duty to take care for the safety of the person or property of another there can be no actionable negligence." 153 S.E.2d 193, 196 (Va. 1967). This statement merely conveys the basic principle that a claim for negligence requires a duty. *See id.* at 197 (holding that a stranded motorist had no duty to safeguard the welfare of good Samaritans who stopped to help her).

F.2d 777, 782 (5th Cir. 1980); *Glendale Fed. Bank, FSB v. United States*, 39 Fed. Cl. 422, 424 (Fed. Cl. 1997); *Kreppel v. Guttman Breast Diagnostic Inst., Inc.*, 1999 WL 1243891 (S.D.N.Y. 1999) (admitted under Fed. R. Evid. 801(d)(2)(B)); *Dean by Williams v. Watson*, 1995 WL 692020 (N.D. Ill, 1996).

[30] Old Republic also argues — wrongly — that Wells Fargo's negligence claim fails because Wells Fargo has indicated that TitlePro and Khan acted intentionally. (OR SJ Mem. at 27.) Willful negligence is actionable and warrants an award of punitive damages. *See Green v. Ingram*, 608 S.E.2d 917, 923-24 (Va. 2005).

This Court identified the standards for finding a duty under Virginia law in *Jappell v. American Ass'n of Blood Banks*, holding that "[i]n determining whether a duty exists, the Court considers factors including foreseeability of harm, the likelihood of injury, the magnitude of the burden of guarding against that injury, and the consequences of placing such a burden on the defendant." 162 F. Supp. 2d 476, 480 (E.D. Va. 2001). Each of these elements is satisfied here.

Old Republic concedes that harm from generating unsecured and unenforceable notes was not only foreseeable, but intended, stating that "[t]he very purpose of FMI's scheme was for the prior deeds of trust not to be paid off, and for the new deeds of trust not to be recorded" by TitlePro and Khan. (OR SJ Mem. at 16.) Moreover, "under a traditional lender's title insurance policy, an assignment of the policy to a secondary mortgage market is anticipated as part of the original mortgage transaction." *Norwest Corp. v. State Dep't of Ins.*, 571 N.W. 2d 628, 635 (Neb. 1997); *see also Superior Bank, F.S.B. v. Tandem Nat'l Mortgage, Inc.*, 197 F. Supp. 2d 298, 320 (D. Md. 2000). Requiring TitlePro and Khan to record title documents and distribute escrow funds in accordance with closing instructions to pay off prior liens is not an unfair burden to place on title agents. Title agents exist to fulfill these obligations.[31] *See Midwest Bankcentre v. Old Republic Title Co. of St. Louis*, 247 S.W.3d 116, 127 (Mo. App. 2008).

## VI.  Wells Fargo's Claims Arising Out of the Summit Drive Transaction are Legally and Factually Sound.

Wells Fargo was defrauded with respect to the Summit Drive property when the conspirators, in a settlement administered by TitlePro, executed multiple original notes and sold those fraudulent notes to multiple lenders. (OR SJ Mem. at 6-8.) Nevertheless, Old Republic seeks summary judgment based on a fundamentally unreasonable inference — that TitlePro and

---

[31] Moreover, as discussed above at 27, the WSA required TitlePro and Khan to fulfill these obligations. Accordingly, TitlePro's and Khan's failure to fulfill these duties is also negligence per se. *See Williamson v. Old Brogue, Inc.*, 350 S.E.2d 621, 624 (1986).

Khan conspired with Taneja to commit fraud in 16 of 17 transactions, but not in number 17.  The Court is precluded from drawing this inference because it must "view[] the facts in the light most favorable to, and draw[] all reasonable inferences in favor of, the nonmoving party."  *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009).

To begin, Wells Fargo has no obligation to prove that Khan knowingly participated in the generation and sale of the multiple fraudulent Summit Drive notes.  Khan, and thus Old Republic, is jointly and severally liable for FMI's actions within the scope of the conspiracy. *Worrie v. Boze*, 95 S.E.2d at 199.  Nevertheless, there are ample undisputed facts to create a reasonable inference that Khan was a knowing participant.  (*See supra* at 6.)

To rebut this evidence, Old Republic offers the statement of a convicted felon and fraudfeasor —Taneja — asserting that he acted alone in conducting the fraudulent Summit Drive transaction.  (OR SJ Mem. at 29.)  Old Republic fails to inform the Court, however, that Taneja also said (OR SJ Mem., Ex. A, ¶ 26) that he was acting alone in the Sawteeth Way transaction, in which Khan fraudulently pretended to sell Khan's own home, and in the Mohegan Drive and Janet Rose Court transactions, in which the property owners, Brar and Riaz, testified that Khan — not Taneja — invented fraudulent refinances and notarized their forged signatures.  (*See supra* at 9.  At the very least, Taneja's conviction and false statements regarding other transactions at issue in this case raise an issue of credibility for the jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Against this backdrop, Old Republic's arguments for summary judgment regarding the Summit Drive transaction are baseless.

*Breach of Contract* — Old Republic admits that it issued a CPL for the Summit Drive transaction and that the CPL applies to losses that arise out of "[f]raud or dishonesty of the Issuing Agent * * * in handling your funds or documents in connection with such closings."

(OR SJ Mem. at 28.)[32]  Old Republic further concedes that Wells Fargo was injured by the conspirators' sale of the multiple competing notes and Khan's failure to file the deed of trust securing Wells Fargo's note because Wells Fargo does not have the uncontested first-lien security interest it was promised.  (OR SJ Mem. at 27.)  Despite this dishonesty, Old Republic has refused to honor, and thus has breached, the CPL.

*Conspiracy, Fraud and Negligence* — As noted above, Khan and Old Republic are liable for the actions of Khan's co-conspirators, FMI and Taneja, and there is ample evidence that Khan knowingly participated in the generation and sale of multiple fraudulent notes.  Old Republic's suggestion that Wells Fargo cannot point to a misrepresentation is false.  It is undisputed that the conspirators represented that the Summit Drive note was secured by a first-lien security interest, and that the conspirators failed to disclose a material fact —they were generating multiple unsecured notes for the same transaction.  (*See* McGrath Dep. 68:20-69:1.)

*Wet Settlement Act* — Old Republic admits that Khan did not record the deed of trust securing Wells Fargo's note for the Summit Drive transaction.  (OR SJ Mem. at 27.)  Wells Fargo, as a person "suffering losses" as a result of Khan's failure to record a deed of trust pursuant to Va. Code Ann. § 6.1-2.13, has a statutory cause of action under § 6.1-2.15.

## CONCLUSION

For the reasons stated above, the Court should deny Old Republic's Motion for Summary Judgment.

---

[32]  Old Republic's argument, in footnote 9, that Wells Fargo has no claim under the CPL because the CPL does not state that it applies to FMI's successors is baseless.  As Wells Fargo explained above at 12, the commitment, ALTA title insurance policy and CPL are parts of the same agreement and the ALTA title insurance policy expressly extends all insurance protection provided by Old Republic to FMI's successors, including Wells Fargo.

Dated: October 16, 2009                    Respectfully submitted,


By: _____/s/_____
        William E. Copley, Va. Bar No. 43960
        August J. Matteis, Jr.
        Derek Y. Sugimura
        Attorneys for Plaintiff Wells Fargo Bank, N.A.
        GILBERT LLP
        1100 New York Avenue NW, Suite 700
        Washington, D.C. 20005
        Telephone:   (202) 772-2200
        Facsimile:   (202) 772-1924
        copleyw@gotofirm.com

## CERTIFICATE OF SERVICE

I, William E. Copley, attorney for Plaintiff Wells Fargo Bank, N.A., do hereby certify that on October 16, 2009, I will electronically file the foregoing Opposition to Defendant Old Republic National Title Insurance Company's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following attorneys of record for Defendant Old Republic National Title Insurance Company:

Frank Douglas Ross, Esq.
Sean Patrick Roche, Esq.
Odin Feldman & Pittleman PC
9302 Lee Highway
Suite 1100
Fairfax, VA 22031
Tel: (703) 218-2100
Fax: (703) 218-2160
Email: douglas.ross@ofplaw.com
Email: sean.roche@ofplaw.com


_____/s/_____
William E. Copley
Va. Bar No. 43960
Attorney for Plaintiff Wells Fargo Bank, N.A.
GILBERT LLP
1100 New York Avenue NW, Suite 700
Washington, D.C. 20005
Telephone:   (202) 772-2200
Facsimile:    (202) 772-1924
copleyw@gotofirm.com